ORAL ARGUMENT NOT YET SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

No. 12-1475

## CITY OF JERSEY CITY

Petitioner,

Vs.

## FEDERAL ENERGY REGULATORY COMMISSION

Respondent.

On Petition for Review from
The Federal Energy Regulatory Commission
_____

## INITIAL BRIEF OF PETITIONER
## CITY OF JERSEY CITY
_____

Derek S. Fanciullo
JERSEY CITY
DEPARTMENT OF LAW
280 Grove Street
Jersey City, NJ  07302
(201) 547-5229
dfanciullo@jcnj.org
Attorney for Petitioner

Dated: April 22, 2013

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Petitioner City of Jersey City hereby certifies as follows:

(A) Parties and Amici:

    1. **Parties Below:[1]**

        Evelyn Preuss
        City of Jersey City, New Jersey
        No Gas Pipeline
        Food & Water Watch
        Sierra Club (New Jersey and Atlantic Chapters)

    2. **Parties Before the Court:**

        a. **Petitioners**

            City of Jersey City, New Jersey
            No Gas Pipeline
            Food & Water Watch
            Sierra Club (New Jersey and Atlantic Chapters)

        b. **Respondent**

            Federal Energy Regulatory Commission

        c. **Intervenors** (to date)

            Consolidated Edison Company of New York
            Texas Eastern Transmission, LP

---

[1] The list of all parties below is voluminous, and it has been previously submitted to the Court with petitioner's Petition for Review. This section lists only those entities that filed timely rehearing requests and are considered parties for purposes of judicial review.

Algonquin Gas Transmission LLC
Statoil Natural Gas LLC

(B) <u>Rulings Under Review</u>:

(1) *Texas Eastern Transmission LP, Algonquin Gas Transmission LLC*, Order Issuing Certificate and Approving Abandonment, Docket CP11-56, 139 FERC ¶ 61, 138 (May 21, 2012)

(2) *Texas Eastern Transmission LP, Algonquin Gas Transmission LLC,* Order Denying Requests for Rehearing, Reconsideration, Stay and Late Intervention, 141 FERC ¶ 61043 (October 18, 2012).

(C) <u>Statement of Related Cases</u>:

To the best of Petitioner's and counsel's knowledge, there are

no related cases pending before the Commission or this Court.

Respectfully submitted,

*/s/ Derek S. Fanciullo*
Derek S. Fanciullo
dfanciullo@jcnj.org
JERSEY CITY
DEPARTMENT OF LAW
280 Grove Street
Jersey City, NJ  07302
Telephone: (201) 547-5229
Facsimile:  (201) 547-5230
Attorney for Petitioner

DATED: April 22, 2013

iii

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 28(a)(1) of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the City of Jersey City is not required to provide a Corporate Disclosure Statement, because the City is a government entity formed under the laws of the State of New Jersey. Accordingly, no Corporate Disclosure Statement has been provided.

Dated at Jersey City, NJ this 22nd day of April, 2013.

Respectfully Submitted,

*/s/ Derek S. Fanciullo*

Derek S. Fanciullo
JERSEY CITY
DEPARTMENT OF LAW
280 Grove Street
Jersey City, NJ  07302
(201) 547-5229
dfanciullo@jcnj.org

Dated: April 22, 2013

iv

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** …………………………………………vii

**GLOSSARY**…………………………………………………………..ix

**JURISDICTIONAL STATEMENT**….………………………………...1

**STATUTES AND REGULATIONS**……………………………….....1

**STANDING**…………………………………………………………1

**STATEMENT OF ISSUES**………………………………………..2

**STATEMENT OF THE FACTS**…………………………………..2
      I.     Pipeline Companies are Perfect
           In Front of FERC…………………………………………3
      II.    FERC's Financial
           Structure……………………………………………….4
           a.  FERC's Costs………………………………………4
           b.  FERC's Sole Income Source……………………………5
      III.   FERC Pipeline Decisions……………………………….7
      IV.   Big Business………………………………………………..9

**SUMMARY OF ARGUMENT**…………………………………..10

**ARGUMENT**………………………………………………...13
      I.     Standard of Review …………………………………..13
      II.    FERC's Financial Structure "Possibly Tempts"
           it to be Biased, and Renders its Adjudications
           Unconstitutional…………………………………………14
           a.  The Possible Temptation Doctrine……………………..14
           b.  FERC Violates the Possible Temptation
              Doctrine – and the Constitution…………………………..18
                1.  FERC's Financial Structure
                    Is Faulty…………………………………………..19
                2.  FERC's Resultant
                     "Possible Temptations"………………………….26

III.  FERC Manifests its "Possible Temptation
      In Actual Bias………………………………………...32
      A.  Unadulterated Favoritism…………………………33
      B.  Boilerplate Language……………………………...34
      C.  Conveniently Heeding/Ignoring
          Expert Agencies………………………………….....35
      D.  Smoking-Gun Evidence of Bias………………………36
      E.  In Sum, Further
          Proof…………………………………………………39

**CONCLUSION**……………………………………………40

**CERTIFICATE OF COMPLIANCE** ………………………...41

**CERTIFICATE OF FILING AND SERVICE** ………………………42

**APPENDIX A:    ADDENDUM OF STATUTES AND REGULATIONS**

**APPENDIX B:    ADDENDUM OF EVIDENCE IN SUPPORT OF
                 STANDING**

# TABLE OF AUTHORITIES

**Cases**[2]

Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkley,
114 F.3d 840, 844 (9th Cir. 1997) …………………………………………17

Brown v. Vance, 637 F.2d 272, 284 (5th Cir. 1981) …………...14, 15, 18, 39

*Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868(2009) …....15, 30, 32

Castillo-Villagra v. INS, 972 F.2d 1017, 1023 (9th Cir. 1992) ...…………..34

City of Pittsburgh v. FPC, 237 F.2d 741, 754 (D.C. Cir. 1954) …………...35

Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002) …………………...32

Esso Standard Oil Co. v. Lopez-Reytes, 522 F.3d 136, 146 (1st Cir. 2008)
…………………………………………………………………………17

*Gibson v. Berryhill, 411 U.S. 564 (1973) …………………………15, 16

Idaho v. I.C.C., 35 F.3d 585, 591 (D.C. Cir. 1994) ……………...………..2

In re Murchison, 349 U.S. 133, 136 (1955) ...……………………….14, 32

Levi v. Holt, 192 Fed.Appx. 158, 162 (3rd Cir. 2006) …………………...33

Lucky Dogs LLC v. City of Santa Rosa, 2012 WL 6679677 (N.D.Cal. 2012)
…………………………………………………………………………15

Miller v. Fenton, 474 U.S. 104, 114 (1985) ...……………………………13

Moreau v. FERC, 982 F.2d 556 (D.C. Cir. 1993) ……………….....……..2

Nakell v. Attorney General of North Carolina, 15 F.3d 319 (4th Cir. 1994)
…………………………………………………………………………13

Offut v. United States, 348 U.S. 11, 14 (1954) ...…………………………14

Paramasamy v. Ashcroft, 295 F.3d 1047, 1051-52 (9th Cir. 2002) ……34, 35


Sandstrom v. Butterworth, 738 F.2d 1200, 1207 (11th Cir. 1984) ...………13

Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1024 (9th Cir. 2009) ………..16

Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995) ………………………...39

*Tumey v. Ohio, 273 U.S. 510 (1927)………………………………15, 19

United Church of the Medical Center v. Medical Center Com'n,
689 F.2d 693, 699 (7th Cir. 1982) ………………………………...17, 18

---

[2] Authorities upon which Petitioner chiefly relies are marked with asterisks.

United States v. 480.00 Acres of Land, 557 F.3d 1297, 1314 (11th Cir. 2009)
...................................................................34

United States v. Loughner, 672 F.3d 731, 760 (9th Cir. 2012) ...............33

*Ward v. Village of Monroeville, 409 U.S. 57 (1972) ...……...14, 16, 18, 27

**Statutes**

15. U.S.C. § 717(r)(b) ………………………………………………1

42 U.S.C. § 7178 ……………………………………………………6

42 U.S.C. § 7178(a) ………………………………………………4, 5

**Regulations**

18 C.F.R. § 382.202 …………………………………………...5, 6

**Rules**

Fed R. App. P. 4(a)(1)(B) ……………………………………..1

**FERC Decisions**

ANR Pipeline Company,
108 FERC ¶ 61,042, 9-10 (July 12, 2004)…………………………………39

Cheniere Creole Trail PL, LP,
115 FERC ¶ 61,331 (June 15, 2006) …………………………...........34

Florida Gas Transmission Co. Phase VIII Expansion,
115 FERC ¶ 61,328 (June 15, 2006) ……………………………………35

Golden Pass Pipeline LP,
112 FERC ¶ 61,041 (July 6, 2005) …………………………………...37

Golden Pass Pipeline LP,
117 FERC ¶ 61,015 (Oct. 4, 2006) …………………………………...37

Gulf  LNG Pipeline,
118 FERC ¶ 61,128,  23-27 (Feb. 16, 2007)…………………………...35, 36

Port Arthur Pipeline, LP,
115 FERC ¶ 61,344 (June 19, 2006) ……………………………………34

Texas Eatern Transmission, LP Logan Lateral,
115 FERC ¶ 61,348 (June 20, 2006) ……………………………………35

**Other FERC Records**

Golden Pass Pipeline LP, EA (Aug. 15, 2006) …………………………38

Golden Pass Pipeline LP, FEIS (May 16, 2005) …………………………..37

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FERC | Federal Energy Regulatory Commission |
| FERC Order | *Texas Eastern Transmission, LP* and *Algonquin Gas Transmission, LLC,* 139 FERC ¶ 61,138 (May 21, 2012) |
| FY | Fiscal Year |
| JA | Joint Appendix |
| NGA | Natural Gas Act |
| Order | Order Granting a Certificate of Public Convenience and Necessity |
| Rehearing Order | *Texas Eastern Transmission, LP* and *Algonquin Gas Transmission, LLC*, 141 FERC ¶ 61,043 (Oct. 18, 2012) |
| Spectra | Respondent-Intervenor Spectra Energy Corp |
| Spectra Pipeline | NJ-NY Expansion Project/Pipeline |

## JURISDICTIONAL STATEMENT

On May 21, 2012, pursuant to Section 7 of the NGA, FERC issued the FERC Order.  FERC Order at 42-44, JA_____. Petitioner timely filed for Rehearing on June 20, 2012.  Jersey City Request for Rehearing (June 20, 2012)JA_____. The Commission denied Rehearing on October 18, 2012 – a final order disposing of all Petitioners' claims.  Rehearing Order at 53, JA_____.  Petitioners timely filed the present Petition for Review on December 12, 2012 under Fed. R. App. P. 4(a)(1)(B) and 15 U.S.C. § 717(r)(b). This Court has original and exclusive jurisdiction per 15 U.S.C. § 717(r)(b).

## STATUTES AND REGULATIONS

Relevant statutes and regulations are contained in attached Appendix A.

## STANDING

As it has suffered "injur[ies] in fact," Petitioner is an aggrieved party pursuant to 15 U.S.C. § 717r(b), and may assert standing to bring the claims

herein.  Moreau v. FERC, 982 F.2d 556 (D.C. Cir. 1993). For example, and

specifically entitling it to raise the Due Process arguments it asserts,

Petitioner is a private landowner and steward of multiple proprietary

interests, and is adversely impacted by the FERC rulings at issue. *See, e.g.,*

Idaho v. I.C.C., 35 F.3d 585, 591 (D.C. Cir. 1994)(indicating a governmental

entity has standing in re its property); *see also* Appendix B (detailing

adverse impacts).


## STATEMENT OF ISSUES


1.  Whether its financial structure gives FERC an unconstitutional

    "possible temptation" to be biased toward pipeline companies in its

    adjudications.

2.  Whether FERC's actual bias toward pipeline companies violates

    either Due Process or the APA.


## STATEMENT OF FACTS


In June 2010, Spectra representatives offered Jersey City a deal – $25

Million, if the City would not oppose the Spectra Pipeline.  When the City

declined, Spectra suggested it reconsider – as Spectra was *guaranteed* to secure approval for the project. It was a stunning threat, for Spectra would not file publicly to build the Spectra Pipeline until *six months later*.

Jersey City should not have been surprised. And, Spectra had every reason to be so bold.

## I.  Pipeline Companies are Perfect in Front of FERC

Pipeline companies have amassed an unfathomable winning streak in front of FERC: Over the past decade, companies that apply to FERC to build natural gas pipelines *always* get what they want.[3]

The pipeline industry's record at FERC is the staggering equivalent of a Major League Baseball team going undefeated for a whole season. At least 160 straight times energy companies have asked permission to build pipelines, FERC has green-lighted both their pipeline proposals and chosen pipeline routes. However, there's a simple reason companies have compiled this implausible streak: FERC relies on pipeline companies and their pipelines to pay *all* its bills.  So, FERC has to "play ball."

---

[3] Petitioners assume companies have *never* lost at FERC.

## II. FERC'S Financial Structure

FERC's unique statutory structure requires the agency to be a business partner to – rather than a regulatory overseer of – the natural gas industry. FERC is the only (1) independent executive agency that (2) must cover *all* its costs through (3) its adjudicative powers vis-à-vis the industry it regulates.  42 U.S.C. § 7178(a).  In both composition and practice, FERC receives *no* tax money. *See Id* (exhibiting an absence of public funding)**;** *see also, e.g.,* FERC FY 2013 Budget Request, http://www.ferc.gov/about/strat-docs/FY13-budg.pdf (last visited April 9, 2013)(requesting no general fund appropriation).

a. *FERC's Costs*

Like any agency, FERC's budgetary needs increase over time for two reasons – (1) expansion of its regulatory responsibilities and (2) "natural" inflation.  *See, e.g.,* FERC 2013 Budget Request (denoting various agency expenses).  In other words, FERC's costs grow as it approves – and must oversee – more pipelines.  *See, e.g.,* FERC 2013 Budget Request, at 42, 84 (indicating FERC hired 58 employees after approving 23 pipelines); *see also*

FERC Budget Website, http://www.ferc.gov/about/strat-docs/budget.asp

(last visited April 14, 2013)(hyperlinking all FERC budget requests and

appropriations). However, FERC's financial needs also grow as

uncontrollable, external costs like rent, insurance premiums and building

maintenance and depreciation costs increase. 2013 Budget Request at 5.

Each year, these "naturally" inflating costs comprise a substantial portion of

the total increase FERC must cover.  For example, increased rent payments

alone generally account for at least 20 percent of the total annual cost

increase the agency faces. *Id.* Thus, even were FERC to "want" to stop

approving pipelines, it could not, as it would still face – and have to cover -

continuously escalating operational costs.


      b. *FERC's Sole Income Source*


      Stated colloquially, FERC covers all its costs – and cost increases - by

"taxing" energy companies: The agency levies fees on natural gas

companies, who pay based on how much gas they transmit via FERC-

approved pipelines. 42 U.S.C. § 7178(a);18 C.F.R. § 382.202.

      When FERC's costs increase, the fees it collects must increase in

lockstep. *Id.* FERC may increase its income in two ways:  It can raise its

"tax" on energy companies; or, it can allow energy companies to build more pipelines to transmit more gas – in essence, expanding FERC's "tax base." *See* 18 C.F.R. § 382.202.

As an example, and as detailed *infra* at 21-26, assume FERC's expenditures double from one year to the next. FERC is statutorily obligated to double its revenue. It may thus either (1) double the "tax" on energy companies, or (2) approve enough new pipelines to double the nation's energy capacity.

While the monies FERC collects go to the United States Treasury, and even though FERC must procedurally submit a budget to Congress, FERC still receives every dollar pipeline companies pay in fees. Over the past nine years, FERC is one of the only federal agencies – indeed, it is likely *the only* agency – that gets every dollar it "requests" from Congress. *See* FERC Budget Website, http://www.ferc.gov/about/strat-docs/budget.asp (hyperlinking FERC budget requests and appropriations). In fact, Congress has no choice: It has statutorily required itself to meet dollar-for-dollar the agency's expenses. 42 U.S.C. § 7178 (indicating FERC *shall* cover its costs via collection of fees).

### III.    FERC Pipeline Decisions

As articulated *supra*, FERC may cover its ever-increasing costs by approving new pipelines. To approve a proposed pipeline, FERC must conclude both (1) the pipeline is necessary – ostensibly, that the nation's energy infrastructure would fail without it; and (2) the pipeline is convenient – that its positives outweigh its negatives. *See, e.g.,* FERC Order at 6-10, R.16-26, JA_____ (explaining FERC's tests for need and convenience). In its decision to approve a general pipeline project, FERC also selects the specific route a pipeline will travel – called pipeline "siting." To "site" a pipeline, FERC must determine the relevant route is environmentally preferable to – or, at least not demonstrably worse than - any proposed alternative. *See* FERC Rehearing Order at 13-14, R.25-26, JA_____.

This said, when they ask FERC for permission to build a pipeline, pipeline companies *never* lose.  Over the past decade, companies have asked to build 160 pipelines. FERC Approved Pipeline Projects Webpage, http://ferc.gov/industries/gas/indus-act/pipelines/approved-projects.asp (last visited April 9, 2013)(hyperlinking all FERC pipeline considerations/approvals). *Every single time*, FERC has approved the relevant pipeline: In 160 straight cases, FERC determined proposed pipelines were (1) absolutely necessary and (2) convenient. *Id*. Put

differently, FERC has never decided a pipeline was merely a "good" or "beneficial" idea, rather than a necessary one. *Id.* Similarly, FERC has never determined the negative consequences of 160 consecutive pipelines outweighed their positives – despite thousands of official public comments in opposition to those pipelines, itemizing an incalculable number of harmful impacts. *Id.*

With respect to "siting," the pipeline industry's record is similarly incredible. Here, it is important to understand the mechanics of a pipeline proposal: Pipeline companies do not approach FERC to build *any* pipeline – they come to FERC to build *the specific* pipeline they propose. FERC Order at 3-4, JA_____ (describing Spectra's specific proposal). However, in any pipeline case, FERC must consider several alternatives to a pipeline company's proposed route – alternatives often suggested in public comments, and advanced to cure significant problems in the company's proposal. *See, e.g.*, FERC Order at 23, R.67-69, JA_____.  Nonetheless, *in every case but one* - 159 of the 160 aforementioned cases - despite considering as many as nearly twenty alternatives in each case, and despite opponents of each pipeline finding dozens – even hundreds – of flaws with a company's proposal - FERC approved the pipeline route the relevant company proposed. FERC Approved Pipeline Projects Webpage,

http://ferc.gov/industries/gas/indus-act/pipelines/approved-projects.asp (last

visited April 9, 2013)(hyperlinking all FERC pipeline

considerations/approvals)  In the lone outlier, FERC suggested the company

alter only 30 miles of a more than 600-mile pipeline – or, less than 5 percent

of the route; however, FERC did not "impose" this change on the project

*until the company agreed to the alteration*.  Ruby Pipeline LLC, 131 FERC

61,007, 23 (April 5, 2010)(noting FERC suggested alternatives, but waited

until the company agreed before it "required" them).


## IV.    Big Business


    This manifest bias has been good business for both FERC and the

energy companies it allegedly regulates. In the past 10 years, as an economic

recession has gutted the budgets of fellow agencies, FERC's bottom-line has

blossomed, from less than $200 Million to more than $300 Million annually

– a whopping 53-percent increase. *See* FERC Budget Website,

http://www.ferc.gov/about/strat-docs/budget.asp (setting forth and tracking

FERC budget requests and appropriations). In practice, this growth allows

FERC to cover $100 Million more in expenses than it could have a decade

ago. Similarly, since 2006, Spectra, via various subsidiaries, has asked

FERC for (and been granted) approval to build approximately 20 pipelines; during this time, its worth has ballooned from $5Billion to $9Billion. GuruFocus Webpage, Spectra Energy Financials, http://www.gurufocus.com/financials.php?symbol=SE (last visited April 14, 2013).

## SUMMARY OF ARGUMENT

A regulatory agency in name and charge, FERC does not – indeed, it cannot – regulate in practice. Instead, as it decides whether to approve proposed pipelines, FERC is schematically compelled to be a "business partner" to the industry it allegedly oversees. This structural impotence violates both the Constitution and the APA.

FERC is literally set up to fail constitutionally. Due Process demands adjudicative agencies be neutral and detached, where even the *appearance* of bias is unconstitutional: Adjudicators cannot have the slightest "possible temptation" to be partisan toward either particular outcomes or particular parties.  But, FERC is biased toward both.  Per federal law, FERC is (1) a self-financing agency that (2) relies *entirely* on the industry it allegedly regulates to pay its bills.  FERC does not receive public tax money. Instead,

to cover its costs, FERC charges pipeline companies based on the amount of gas they transmit via FERC-approved pipelines.  In sum, as FERC's costs increase, the agency has two options – it can either charge companies more, or let companies build more pipelines. Either way, FERC receives *all* its funding from pipeline companies and the pipelines they propose, build and operate.  But, whereas one option (taxing companies more) hurts the industry that feeds FERC financially, the other (approving more pipelines) helps *both* pipeline companies and FERC.  Moreover, simple math says FERC ultimately *must* approve pipelines: FERC can only raise taxes so high; eventually, pipeline companies would run out of revenue to pay – and FERC would go out of business. This faulty financial structure violates the Constitution in at least three related ways:

1)  In that FERC is responsible for self-financing, but able to approve pipelines to generate income, it faces the impermissible "possible temptation" to be biased toward approving pipelines – regardless of the legitimacy of the opposition to or inadequacies in pipeline proposals.

2)  In that FERC ultimately *needs* to approve pipelines to stay solvent, FERC has the impermissible "possible temptation" to create an

atmosphere that encourages pipeline companies to be "repeat players" – to continue to bring new pipeline proposals to FERC for approval: Pipeline companies are objectively far more likely to invest in the costly approval process if they know a payoff is guaranteed.

3) In that FERC receives all its funding from the pipeline industry, and none from the public, FERC faces the impermissible "possible temptation" to favor the pipeline industry over the public in its adjudications.

These violations both independently and together render FERC an unconstitutional adjudicator, and invalidate its decisions.

Furthermore, FERC's "possible temptations" frequently manifest themselves in impermissible actual bias in agency adjudications – or, at least, in questionable agency behavior.  Proof of FERC's regulatory failure lies in its historical record – and the unblemished record of pipeline companies that seek agency approval.  But, beyond its universal favoritism of the industry, FERC commits several egregious violations in its adjudications: It frequently, illegitimately relies on boilerplate language to explain its decisions and reject opposition; it inconsistently heeds the

directives of other expert agencies, depending on whether they render helpful or harmful opinions on pipelines up for approval; and, even worse, FERC has altered *its own decisions* when pipeline companies have demanded it. These marks of actual bias not only violate Due Process and the APA, they provide compelling evidence FERC succumbs to its "possible temptation" to favor pipeline companies, wrongly approves proposals, then attempts to "cover its tracks."

## **ARGUMENT**

As a self-financing independent executive agency reliant on the natural gas industry to supply its entire budget, FERC is an unconstitutionally biased adjudicator of pipelines.

### **I.  Standard of Review**

Questions of adjudicative bias are subject to *de novo* review. Nakell v. Attorney General of North Carolina, 15 F.3d 319 (4th Cir. 1994)(citing Sandstrom v. Butterworth, 738 F.2d 1200, 1207 (11th Cir. 1984); *see also*, Miller v. Fenton, 474 U.S. 104, 114 (1985).

## II. FERC's Financial Structure "Possibly Tempts" it to be Biased, and Renders its Adjudications Unconstitutional

A. *The Possible Temptation Doctrine*

At minimum, Due Process requires fair adjudicative proceedings before neutral and detached decision-makers. <u>Ward v. Village of Monroeville</u>, 409 U.S. 57, 59-60 (1972).  Clearly, the Constitution mandates adjudicative proceedings be free of actual bias.  <u>In re Murchison</u>, 349 U.S. 133, 136 (1955). However, it also forbids the mere *appearance* of bias in adjudications, even if "such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties … [for] justice must satisfy the appearance of justice."  *Id*; *see also* <u>Offut v. United States</u>, 348 U.S. 11, 14 (1954) (placing paramount the appearance of justice in adjudications); <u>Brown v. Vance</u>, 637 F.2d 272, 284 (5th Cir. 1981).

Whether an adjudicator's apparent bias contravenes the Constitution is measured objectively: Due process stands violated when a decision-maker faces "a *possible temptation* to the average man as a judge ... which might

lead him not to hold the balance nice, clear and true." <u>Tumey v. Ohio</u>, 273 U.S. 510, 532 (1927)(emphasis added).  This objective inquiry considers all "circumstances and relationships" that might push an adjudicator to be partisan.  <u>See</u> <u>Caperton v. A.T. Massey Coal Co., Inc.</u>, 556 U.S. 868, 880, 885 (2009). For instance, when one of the parties before a judge is a political contributor, whose contributions dwarfed all others in the judge's election campaign, the judge faces an unconstitutional "possible temptation" to favor the contributor over any non-contributor. <u>Caperton</u>, 556 U.S. at 885. However, the adjudicator's stake in the relevant proceedings need not be "direct or positive" to violate Due Process.  <u>Gibson v. Berryhill</u>, 411 U.S. 564, 577 (1973)(holding unconstitutional the "possible temptation" to rule based on the possible*,* attenuated elimination of economic competition). For example, a statutory scheme that (1) permits forum-shopping, and (2) compensates judges based on the number of cases filed in their courts violates the Constitution, for it presents judges the "possible temptation" to favor plaintiffs in their decisions – as fostering a pro-plaintiff atmosphere might cultivate "business."  <u>Brown</u>, 637 F.2d at 284-5; *see also* <u>Lucky Dogs LLC v. City of Santa Rosa</u>, 2012 WL 6679677 (N.D.Cal. 2012) (declaring unconstitutional an adjudicator that was financially reliant on a particular party becoming a "repeat player" before it, as the adjudicator faced the

"possible temptation" to rule for the party, and create an atmosphere more likely to induce the party to return.)

Initially pegged to a judge's personal pecuniary gain, the "possible temptation" doctrine expanded to disqualify adjudicators who are responsible for governmental budgets, and whose decisions may help their governmental bodies make ends meet. In Monroeville, 409 U.S. 57 (1972), the mayor of Monroeville, Ohio was responsible for his village's finances. Per state law, Ohio's mayors sat as judges in cases involving minor offenses in their respective localities. *Id* at 58. The Monroeville mayor's "court" produced revenue (in fines, forfeitures and fees) that accounted for roughly 40 percent of his village's income - or, as the Supreme Court stated, "a substantial portion of [the] municipality's funds." *Id* at 59. The Court thus deemed the Mayor incapable of affording Due Process to defendants, holding a "possible temptation … exist[s] when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Id* at 60.

Just as it governs individual adjudicators, the "possible temptation" standard "applies with equal force to … administrative [agencies]." Gibson, 414 U.S. 564 (1973) (extending Monroeville to administrative agencies); *see also* Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1024 (Noonan, J.,

16

concurring)(9th Cir. 2009) (applying the "possible temptation" doctrine to agencies is an "elementary" extension). In short, agencies may not have a stake in the matters they adjudicate – or, in legal terms, operate pursuant to a "dual status as judge and a party interested in the outcome of the proceedings." United Church of the Medical Center v. Medical Center Com'n, 689 F.2d 693, 699 (7th Cir. 1982); *see also* Gibson, 411 U.S. 564 (1973).  When an agency adjudicates, Due Process is offended when "the decision-maker, because of [its] institutional responsibilities, would have so strong a motive to rule in a way that would aid the institution." Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkley, 114 F.3d 840, 844 (9th Cir. 1997)(internal quotation omitted).  To this end, when an agency may use its adjudicative powers to supply more than *de minimus* funds for its budget, it cannot afford Due Process.  United Church, 689 F.2d at 699 (7th Cir. 1982); *see also* Esso Standard Oil Co. v. Lopez-Reytes, 522 F.3d 136, 146 (1st Cir. 2008)(noting that an agency with a budget dependent upon fines it issues faces a "possible temptation" that is "intensifie[d]" by the size of the fine relative to the agency's budget). This remains true even when the money collected via an agency's adjudications is paid into a government treasury or other fund first, rather than remitted to the agency directly.  *Id*

(noting funds were not paid directly to agencies, but holding those agencies'
adjudications unconstitutional).

Of significance, an adjudicative entity's "possible temptation" to be
unconstitutionally partisan invalidates its decisions *without any*
*consideration* of its decisions themselves. *See, e.g.,* <u>Monroeville</u>, 409 U.S. at
60 (invalidating a mayor as an adjudicator based on his "situation", without
analyzing the decision at issue)[4]. As the "possible temptation" standard
seeks to stifle the mere appearance of bias, the actual procedures an
adjudicative agency uses, the decisions it makes, and the rationales it
proffers therefore are all *immaterial*: The "possible temptation" to be biased
so infects adjudicative proceedings that *no* decision the adjudicator makes
can be constitutionally sound. *Id*; *see also* <u>Brown</u>, 637 F.2d at 284. As the
<u>Monroeville</u> Court held, when "an official perforce occupies two practically
and seriously inconsistent positions, one partisan and the other judicial, [it]
*necessarily involves a lack of due process* of law." <u>Monroeville</u>, 409 U.S. at
60 (emphasis added).


   B. *FERC Violates the Possible Temptation Doctrine – and the*
      *Constitution*

---

[4] Though <u>Monroeville</u> is cited, this principle is evident in every case noted herein.

FERC's relationship with – and, more specifically, its financial reliance on - pipeline companies thus necessarily renders the agency's adjudications unconstitutional. When FERC approves pipelines, it effectively puts money into the pockets of the energy companies that build them, then receives a fraction of that money back to cover its own costs. This profit-sharing system means, when it adjudicates pipeline proposals, FERC cannot "hold the balance nice, clear and true." Tumey, 273 U.S. at 532.

1. FERC'S Financial Structure is Faulty

Pipelines are unquestionably profitable. Over the past five years, for example, Spectra Energy has reported profit margins as high as 93-percent. YCharts website, Spectra Energy Partners Profit Margin, http://ycharts.com/companies/SEP/profit_margin (last visited March 16, 2013). More pipelines equal more profit: It is why Spectra has applied to build 20 pipelines since 2006, and concurrently – but, not coincidentally - nearly doubled its net worth. GuruFocus Webpage, Spectra Energy Financials, http://www.gurufocus.com/financials.php?symbol=SE (last

visited April 14, 2013). Of note, Spectra saw this robust growth during a

global recession. BBC News Webpage, Global Recession Timeline,

http://news.bbc.co.uk/2/hi/8242825.stm (last visited April 14, 2013).

  Similarly, approving pipelines has been good for FERC's bottom-line.

Over the past decade, FERC has seen its annual budget grow by more than

50-percent - rocketing from sub-$200-Million in 2004 to a more than $300-

Million in 2013. FERC's budgetary boom occurred during the same

recession referenced *supra* - when FERC's independent executive agency

siblings saw their budgets slashed by hundreds of millions of dollars. *See,*

*e.g.* Stewart, James B., As Watchdog Starves, Wall Street is Tossed a Bone,

New York Times Website,

http://www.nytimes.com/2011/07/16/business/budget-cuts-to-sec-reduce-its-

effectiveness.html?pagewanted=all&_r=0 (last visited April 9, 2013); *see*

*also* FoxNews Webpage, NASA's space exploration plans take a galactic

hit, http://www.foxnews.com/scitech/2012/02/13/nasa-funding-cuts-coming-

space-exploration-to-suffer/(last visited April 9, 2013).  The evidence

indicates FERC's ability to approve pipelines to bolster its budget makes it

recession-proof: The agency need not make difficult choices – whom to lay

off, what services to cut, which offices to close – because it can simply

approve more pipelines, and make more money.

However, this "win-win" business partnership between FERC and the pipeline industry contravenes the Constitution.  That an American corporation makes a profit is neither unreasonable nor unconstitutional. Similarly, that a federal agency remains financially solvent is hardly a problem. What *is* forbidden: When self-interested, profit-making corporations are effectively allowed to control an alleged "regulatory" agency's purse-strings – and, hence, the agency's adjudications.  Alas, this is exactly what FERC's statutory and regulatory schemes encourage: With its entire budget reliant upon both the willingness and ability of energy companies to build, operate and pay fees on natural gas pipelines, FERC faces an unconstitutional "possible temptation" to engage in a mutually lucrative profit-sharing scheme with those companies, to ensure they continue paying its bills.

Given this truth, a simple mathematical example – **Example 1** - exposes the root problem with FERC's structure. Assume FERC must double its "income" from one year to the next to meet growing financial pressures.  Further, say a pipeline company enjoys a profit margin on all its pipelines of 100 percent, prior to paying FERC fees. Finally, suppose FERC initially charged fees amounting to 10 percent of a company's pre-"tax" profit margin.

21

- Were FERC to merely double its "tax" on the pipeline company, FERC would cover its increased expenses, but the pipeline company would lose money:

  o <u>Year One</u>:    $100(\text{profit})^5 - 10(\text{tax}) =$
  **90(profit)**
  **10(tax)**

  o <u>Year Two</u>:    $100(\text{profit}) - [2\text{x}10(\text{tax})] =$
  **80(profit)**
  **20(tax)**

- But, were FERC instead to approve a second company pipeline in Year Two, it could keep its "tax" flat, and *both* the agency and the pipeline company would make money:

  o <u>Year Two</u>:

          Pipeline One $[100[(\text{profit}) - 10(\text{tax})]$
  $+$     Pipeline Two $[100(\text{profit}) - 10(\text{tax})]$
  _____
         **180(profit)**
         **20(tax)**

Though accurate, **Example 1** is overly simplistic. FERC's regulatory scheme calls for – as the agency terms it – a "proportional volumetric charge on each company."  Rehearing Order at 11, R.21, JA____.

---

[5] Again, for purposes of all calculations, the term "profit" describes "pre-tax" profit.

By incorporating this nuance, **Example 2** gives real-world life to FERC's funding structure, but still illustrates its fatal flaw.  Assume two companies – **C1** and **C2 -** own and operate identical pipelines.  Using the values in **Example 1**, again assume FERC must double its income:

- - As in **Example 1**, FERC could double its income by merely doubling its tax on both pipeline companies.  But, while FERC would cover its increased expenses, the pipeline companies would lose money:

    - o Year One:

        - ▪ **C1**:   [100(profit) – 10(tax)] =
                            **90(profit)**
                            **10(tax)**
        - ▪ **C2**:   [100(profit) – 10(tax)] =
                            **90(profit)**
                            **10(tax)**
        - ▪ **FERC**: 10(tax) + 10(tax) = **20(tax)**

    - o Year Two:[6]

        - ▪ **C1**:   [100 (profit) – 2 x 10 (tax)] =
                            **80 (profit)**
                            **20 (tax)**
        - ▪ **C2**:   [100(profit) – 2x10(tax)] =
                            **80(profit)**
                            **20(tax)**
        - ▪ **FERC**: 20 (tax) + 20 (tax) = **40 tax**

---

[6] In Example Two, FERC must double its "income" from 20 to 40.

23

- However, rather of raising taxes, consider the "win-win" FERC may engineer by instead allowing **C1** to build two new pipelines in Year Two:

  o Year Two:

    ▪ **C1**:

      | | | |
      |---|---|---|
      | | [PIPELINE 1] | [100(profit) − 10(tax)] |
      | + | [NEW PIPELINE] | [100(profit) − 10(tax)] |
      | + | [NEW PIPELINE] | [100(profit) − 10(tax)] |

      C1 TOTAL:     **270(profit)**
                    **30(tax)**

    ▪ **C2**:  [100 (profit) − 10 (tax)] =
                    **90 (profit)**
                    **10 (tax)**

    ▪ FERC:

      | | | |
      |---|---|---|
      | | [**C1**,PIPELINE 1] | 10(tax) |
      | + | [**C1**,PIPELINE 2] | 10(tax) |
      | + | [**C1**,PIPELINE 3] | 10(tax) |
      | + | [**C2**] | 10(tax) |

      FERC TOTAL:     **40(tax)**

Even when "proportional volumetric charges" are considered, **Example 2** illustrates that FERC faces the same two options to cover its costs. Here, each company pays its regulated "proportional volumetric charge" – in this

24

case, **C1** pays three times the tax of **C2** because operates three times the pipelines. Nevertheless, FERC still has to choose: It may hurt pipeline companies by doubling taxes, or create a win-win – cover its costs while (1) keeping both companies' taxes flat, and (2) tripling **C1's** profit.

This said, though it *appears* FERC has two viable means to raise revenue, the agency ultimately has only one failsafe option. **Example 3** shows FERC *must* encourage pipeline construction, as it *cannot* exclusively tax companies to cover its costs.  Imagine, using the same values, FERC's budgetary needs grew one dollar ($1.00) more than ten-fold.  In this scenario, even were pipeline companies to recover a full 100 percent "pre-tax" profit on the pipelines they build, the math becomes *impossible* – FERC would become insolvent *unless it approves more pipelines*:

- If FERC chose to simply increase its "tax" on pipelines, it could not fully fund its budgetary needs:

    o <u>Year One</u>:    100(profit) – 10(tax) =
                    **90(profit)**
                    **10(tax)**

    o <u>Year Two</u>:    100(profit) – {[10x10 + $1.00] (tax)} =
                    ***-$1.00***
                (FERC would fall $1.00 short of covering its expenses)

25

- Thus, FERC may *only* supply enough funding to cover its needs *if it approves more pipelines*:

  o <u>Year One</u>:    100(profit) – 10(tax) =
                                    **90(profit)**
                                    **10(tax)**

  o <u>Year Two</u>:   {10 x [100(profit) – 10(tax)]} -$1.00(tax) =
                                    **899(profit)**
                                    **101(tax)**[7]

2. <u>FERC'S Resultant "Possible Temptations"</u>

The result of its faulty financial structure, FERC adjudications violate Due Process in several discrete ways, which may be merged into a unitary "meta-violation."

a. *A Bias Toward Pipeline Approval*

First, FERC has an impermissible "possible temptation" to be biased toward "generic" pipeline approval. Responsible for covering ever-increasing costs, but blessed with the ability to approve new pipelines to pay its bills, FERC is unconstitutionally "tempted" to use its adjudicative powers in its own self-interest: Green-lighting more pipelines grows its bottom-line,

---

[7] For brevity, the addition of revenues for pipelines 1-10 is here effectuated via multiplication.

and assures it makes ends meet. Recall, every dollar that flows into FERC is the byproduct of gas that flows through a FERC-approved pipeline. As each of the foregoing equations shows, regardless of whether FERC raises "taxes" on pipeline companies, the more pipelines FERC approves, the more money it makes. If it were to reject pipelines, FERC would lose potential revenue streams. In <u>Monroeville</u> terms, FERC's "executive responsibilities for … [agency] finances may make it partisan to maintain the high level of contribution from" the agency's approval of additional pipelines. <u>Monroeville</u>, 409 U.S. at 60. In that FERC receives *all* – as opposed to just a "substantial portion" – of its funds from pipelines it approves, FERC's adjudicative processes are at least as constitutionally infirm as the <u>Monroeville</u> Mayor's court. *Id*.

Of note, while this "generic" bias itself violates Due Process, it is impossible to dissociate FERC pipeline decisions from pipeline companies: Companies in fact only build the pipelines they propose. Thus, as FERC is biased toward "generic" pipelines, it is necessarily partisan toward "company-proposed" pipelines.

> b. *FERC'S Compulsion to Approve*

27

Even worse, to maintain long-term solvency, FERC is subject to what may be called an "absolute compulsion" to approve pipelines. Indeed, approving pipelines is also the *only* way FERC can ultimately stay in business: As explained *supra*, FERC can tax only so much: Eventually, pipeline companies will lose the ability to pay. This means FERC eventually *must* approve pipelines.

If nothing else, just as the judges is <u>Brown</u> were "tempted" to foster an unconstitutional pro-plaintiff atmosphere to encourage filings in their courts, FERC is unconstitutionally "tempted" to foster a pro- company atmosphere, to ensure companies continue to file pipeline applications: As FERC itself has indicated, the pipeline approval process is highly costly to companies; at minimum, it is objectively reasonable to believe that those companies will be far more likely to bear that cost if they are virtually guaranteed a pay-off. Rehearing Order at 13, R.24, JA_____.

Pushed to the extreme, however, it becomes clear FERC cannot even truly choose, let alone adjudicate in compliance with Due Process:  Once FERC has raised taxes on existing pipelines to their absolute limit, the agency *would be required* to approve pipelines to meet any increase in its costs, regardless of whether those pipelines were "necessary and convenient" – or even base-level safe or environmentally-sound.

28

c.  *The Public's Absence*

The foregoing equations expose the unconstitutionality of FERC's adjudications by their omissions as much as their conclusions.  Glaringly absent from FERC's calculus – as they are glaringly absent from FERC's funding structure – are the American people. The lone agency financed entirely by the industry it oversees, FERC receives *no* public tax dollars.  In practice, this means Congress cannot adjust the public contribution to FERC's budget if lawmakers (representing their citizen constituents) want to punish or encourage FERC behavior. Indeed, FERC answers *only* to the energy companies it allegedly regulates.

Thus, the potential for – perhaps more accurately, the pressure on - FERC to favor the pipeline industry is more extreme than even the Due Process risk Caperton contemplated.  There, the contributor to the judge's political campaign only gave an overwhelmingly large amount; here, the pipeline industry contributes *all* of FERC's bottom line, while the public provides nothing.

This not only emphasizes FERC's need to "work with" pipeline companies to entice them to propose projects, it represents another,

independent "possible temptation."  In this context, it is important to recall

FERC has available two options to increase its income: One of them is

beneficial to the pipeline industry – approving more pipelines, so pipeline

companies generate more profit and pay a flat tax; the other is detrimental to

the industry – simply increasing the tax on pipeline companies, thus cutting

their profits. As Caperton stands for the broad, objectively commonsense

proposition that an entity with such overwhelming influence over an

adjudicator's finances gives rise to unconstitutional potential bias, then

FERC is an extreme example of this principle, and its adjudications are

invalid. Though "no allegation of a *quid pro quo* agreement" need exist, the

pipeline industry's "extraordinary contribution" to FERC's bottom line

poses a "serious risk of actual bias based on objective and reasonable

perceptions" that makes FERC a constitutionally unacceptable adjudicator of

pipeline industry applications. Caperton, 556 U.S. at 870, 884.

Free from the responsibilities inherent to public funding, FERC may

exercise with impunity its unconstitutional "possible temptation" to favor

pipeline companies – while the public bears the resultant significant cost. In

Jersey City alone, while FERC and Spectra have worked together to bolster

their bottom-lines, the City and dozens of other property owners have had to

cede land to Spectra, to make way for the Pipeline; potentially billions of

dollars of development – and the resultant massive expansion of the City's tax base - must be foregone, as Spectra's easements make much new construction impossible; and, most troublesome of all, roughly 250-thousand people in one of the nation's most densely populated cities will be put at risk once the Pipeline becomes operational, as it would cause catastrophic damage were it to rupture.

### d.  *The Complete Picture*

FERC's Due Process failings thus achieve full relief:  On multiple levels, the agency's legal framework precludes it from complying with the Constitution.  First, FERC faces an impermissible "possible temptation" – even more, it is *compelled* – to use its adjudicative powers to cover its ever-rising costs.  Second – and relatedly - to ensure pipeline companies continue to build pipelines as they must (lest FERC fail financially), FERC faces the impermissible "possible temptation" to foster a pro- company adjudicative atmosphere, where energy companies are assured they will "win if they play."  Finally, the relative statuses of the adversarial parties in the proceedings before FERC intensify the pressure it faces to be partisan, as FERC faces an impermissible "possible temptation" to favor the party that

contributes *exclusively* to its bottom line (the pipeline industry), over the party that provides nothing (the public). Any of these deficiencies in FERC's structure renders its adjudicative proceedings unconstitutional, and its decisions void. That they may be aggregated into a single, coherent "meta-violation" only highlights how far out of compliance with the Constitution FERC stands: In sum, FERC is objectively, impermissibly "tempted" to use its adjudications to benefit itself and the pipeline industry, at the expense of the public – the only "participant" in FERC's proceedings without any influence over them.

### III.    FERC Manifests its "Possible Temptation" in Actual Bias

If Due Process forbids the appearance of bias, an adjudicator's actual bias is clearly unconstitutional. Murchison, 349 U.S. at 135. Similarly, an agency's actual bias violates the APA. *See* Caperton, 556 U.S. at 884(equating actual bias and prejudgment); *see also* Davis v. Mineta, 302 F.3d 1104, 1112 (10th Cir. 2002)(indicating prejudgment strips an offending agency of deference under the APA).

Though nebulous, the test to show actual bias is effectively two-pronged. First, an adjudicator must nearly always rule in favor of a particular

party. *See* Levi v. Holt, 192 Fed.Appx. 158, 162 (3rd Cir. 2006); *see also*

U.S. v. Loughner, 672 F.3d 731, 760 (9th Cir. 2012)(intimating that had a

decision-maker always favored the government, it would have been

evidence of actual bias). Second, "other violations in the proceedings [must

be] apparent." *Id*.

When its proceedings are viewed over time, FERC thus exhibits clear

bias toward the pipeline industry: It both (1) shows universal favoritism

toward pipeline companies and (2) commits several serious violations in its

adjudications.


A. *Unadulterated Favoritism*


Whether pipeline companies will "win" when they appear in front of

FERC is not a question – it is a foregone conclusion.  As discussed *supra*,

over the past decade, FERC has approved (1) *every one* of the 160 pipelines

natural gas pipelines, and (2) *all but one* pipeline route that companies have

proposed.  The pipeline industry's "winning percentage" in FERC

adjudications is  (1) 100% in re pipeline approvals, and (2) 99.375% in terms

of pipeline siting.

B. *Boilerplate Language*

Both Due Process and the APA require FERC to give individualized attention to pipeline applications – and any opposition to them.  *See, e.g.*, U.S. v. 480.00 Acres of Land, 557 F.3d 1297, 1314 (11th Cir. 2009)(indicating an agency responsible for making multiple similar decisions only complies with due process if it evaluates each case on the basis of individualized facts). However, an agency's use of boilerplate language to justify its decisions is strong evidence the agency has "failed to provide requisite individualized evaluation[s]."  Paramasamy v. Ashcroft, 295 F.3d 1047, 1051-52 (9th Cir. 2002)(citing Castillo-Villagra v. INS, 972 F.2d 1017, 1023 (9th Cir. 1992)).

Across several years of decisions, FERC frequently has used boilerplate language in its orders, to answer opposition to pipeline proposals, legitimize its predetermined approvals of pipelines - and deny parties opposed to those pipelines their rights.  Over the past decade, for instance, nearly every time FERC must rebuff public concerns over a potential terrorist attack to a particular pipeline, it responds with an identically-worded rebuttal. *Compare, e.g., Cheniere Creole Trail PL, LP*, 115 FERC ¶ 61,331, 23 (June 15, 2006), *with Port Arthur Pipeline, LP,* 115 FERC ¶

34

61,344, 25 (June 19, 2006), *and Texas Eastern Transmission, LP Logan Lateral*, 115 FERC ¶ 61,348 (June 20, 2006)(setting forth identical rejections of terrorism concerns).  The agency uses boilerplate explanations to reject several common claims of opponents. *Compare, e.g.*, *Florida Gas Transmission Co. Phase VIII Expansion,* 115 FERC ¶ 61,328, 20 (June 15, 2006) *with Gulf LNG pipeline LLC,* 118 FERC ¶ 61,128, 25  (Feb. 16, 2007)(dispatching EPA-raised environmental justice concerns in near-identical language).  FERC thus fails to "provide requisite individualized evaluation[s]" of pipelines – and reaps a substantial resultant benefit: FERC can deflect hard-to-answer questions with these stock responses; in the context of an individual case, a reviewing Court will be unable to identify the language as boilerplate, and it will mistakenly afford the relevant agency conclusion deference. Paramasamy, 295 F.3d at 1050 (noting boilerplate justifications make adequate judicial review impossible).

C. *Conveniently Heeding/Ignoring Expert Agencies*

When "other agencies are more directly responsible and more competent than [FERC] … [FERC] would, of course, do well to respect the views of such other agencies as to those problems." City of Pittsburgh v.

35

FPC, 237 F.2d 741, 754 (D.C. Cir. 1954). However, FERC only pays heed

to "more competent" agencies when it is convenient, and dismisses their

concerns when it is not.  For instance, FERC gladly cites EPA opinions

when they support approval of a pipeline. Rehearing Order at 23 R. 44, n.73-

74, JA_____(raising offensively EPA's cooperation in the EIS, and

agreement with FERC's handling of environmental justice concerns). But,

FERC overrides or ignores EPA opinions when they would block approval

of a pipeline. *See, e.g., Gulf LNG Pipeline*, 118 FERC at  23-27 (Feb. 16,

2007) (rejecting multiple EPA concerns, including concerns over FERC's

handling of environmental justice issues).


### D. *Smoking-Gun Evidence of Bias*


Most alarmingly, FERC has done more than exhibit actual bias in

favor of the pipeline industry: It has directly ceded control of at least one

adjudication to a pipeline company.

On July 6, 2005, FERC approved the pipeline proposal of Golden

Pass LP – an ExxonMobil subsidiary. But, on October 4, 2006, it approved a

major alteration to that initial route – an alternative FERC had deemed both

impracticable and environmentally worse only fifteen months before.

36

In its approval of the initial Golden Pass pipeline proposal, FERC indicated it analyzed several options, and found "*no reasonable alternatives … would be environmentally preferable to the proposed site.*" *Golden Pass Pipeline*, 112 FERC ¶ 61,041, 26-27 (July 6, 2005)(emphasis added). FERC rubber-stamped the project's FEIS, which determined there existed "no practical alternative sites." FERC Golden Pass Pipeline FEIS ES-7 (May 16, 2005). To wit, FERC specifically declared "use of a single 42-inch-diameter pipeline would not meet the [project's] design criteria." *Id* at 3-35. However, to say *FERC* eliminated a 42-inch pipeline from consideration is misleading: The agency merely acquiesced when *Golden Pass* decided against it. *Id* (indicating Golden Pass reasoned against a 42-inch option, and FERC merely agreed).

Just fifteen months later, FERC did a radical about-face, but not because the agency changed its mind: *The pipeline company had*. In FERC's own words, Golden Pass re-engaged the agency after deciding it wanted to make "certain changes in the design and routing of the certified pipeline." *Golden Pass Pipeline*, 117 FERC ¶ 61,015, 1 (Oct. 4, 2006). The company wanted to build a single 42-inch diameter pipeline, to replace the two smaller pipelines it originally asked for FERC's permission to build. *Id* at 2. Not surprisingly, money inspired the company's change of heart: Chief on

its shortlist of reasons for seeking the alteration, Golden Pass had

underestimated the cost of the pipeline it initially wanted to build, and

sought to "mitigate … the total cost increase that would be associated with

construction of the originally authorized Golden Pass Pipeline project." *Id* at

1.  Recall, in approving the initial Golden Pass pipeline, FERC specifically

determined (1) a 42-inch diameter pipeline was impracticable, and (2) *no*

alternatives were environmentally preferable.  Nonetheless, at the behest of

Golden Pass, FERC approved the alternative route: FERC concluded that the

change the pipeline company requested was not only (1) suddenly feasible,

but (2) suddenly "environmentally preferable" to the initial Golden Pass

proposal. FERC Golden Pass Pipeline EA at 23 (Aug. 15, 2006). In

approving the new route, FERC and Golden Pass even sugar-coated its name

- "The Optimized Route Variation." EA at 1.

    Not surprisingly, though it was quick to back the company's new

route choice, FERC rejected with minimal explanation *all* publicly proposed

alternatives during both the July 2005 and October 2006 adjudicative

processes. *See, e.g.,* 117 FERC at 6.

    Again, the *only* apparent difference between July 2005 and October

2006: Golden Pass decided the alternative pipeline proposal would save it

money.  And, not surprisingly, FERC bent to the company's will.

This is not the only time FERC has let the pipeline industry "wag the dog." For instance, FERC has also retracted requirements it tentatively imposed on a pipeline project, after the relevant company protested the measures. ANR Pipeline Company, 108 FERC ¶ 61,042, 9-10 (July 12, 2004).

E. *In Sum, Further Proof*

The combination of (1) FERC's universal favoritism to pipeline companies, and (2) the regular, egregious violations in its proceedings demonstrates the agency is actually biased toward the pipeline industry, in violation of both the Constitution and the APA.

If nothing else, this evidence of actual bias doubles as proof of FERC's "possible temptation" to be partisan. As Courts have noted, rarely are "the two categories of bias claims … hermetically sealed." Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995). Frequently, "possible temptation bloom[s] into questionable behavior." Brown, 637 F.2d at 286. So it is with FERC: FERC is both tempted and compelled to make decisions in favor of pipeline companies, and the agency uses the aforementioned dubious means to obscure its infirm processes.

## <u>CONCLUSION</u>

For any and all of the reasons foregoing, petitioners pray the Court

overturn FERC's May 21, 2012 Order and October 18, 2012 denial of

Rehearing.

Respectfully submitted,


*/s/ Derek S. Fanciullo_____*
Derek S. Fanciullo
JERSEY CITY
DEPARTMENT OF LAW
280 Grove Street
Jersey City, NJ  07302
(201) 547-5229
dfanciullo@jcnj.org


Dated: April 20, 2013

## <u>CERTIFICATE OF COMPLIANCE</u>

This opening brief complies with the type-volume limitation established in this Court's order of February , 2013. The brief's type-size and type-face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is 6,951 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. Rule 32(a)(1). I relied on my word processor to obtain the word count.

Respectfully submitted,

*/s/ Derek S. Fanciullo*
Derek S. Fanciullo

Dated: April 22, 2013

41

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Fed. R. App. P. 25(d), and the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on April 20, 2013.  I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated this 22nd day of April 2013,

*/s/ Derek S. Fanciullo*
Derek S. Fanciullo

# APPENDIX A

# **TABLE OF CONTENTS**

15 U.S.C. § 717r …………………………………………………...…45

42 U.S.C.A. § 7178 …..................................................................49

18 C.F.R. § 382.202 ………………………………………………….51

15 U.S.C.A. § 717r

United States Code Annotated
Title 15. Commerce and Trade
Chapter 15B. Natural Gas
**§ 717r. Rehearing and review**


(a) Application for rehearing; time

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission

shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

(c) Stay of Commission order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(d) Judicial review

(1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or operated shall have original and exclusive

jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as "permit") required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

(2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

(3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title , the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

(4) Commission action

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

(5) Expedited review

47

The Court shall set any action brought under this subsection for expedited consideration.

42 U.S.C.A. § 7178

United States Code Annotated  Title 42. The Public Health and Welfare
Chapter 84. Department of Energy
 Subchapter IV. Federal Energy Regulatory Commission
**§ 7178. Federal Energy Regulatory Commission fees and annual charges**

(a) In general

**(1)** Except as provided in paragraph (2) and beginning in fiscal year 1987 and in each fiscal year thereafter, the Federal Energy Regulatory Commission shall, using the provisions of this section and authority provided by other laws, assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year.

**(2)** The provisions of this section shall not affect the authority, requirements, exceptions, or limitations in sections 803(e) and 823a(e) of Title 16.

(b) Basis for assessments

The fees or annual charges assessed shall be computed on the basis of methods that the Commission determines, by rule, to be fair and equitable.

(c) Estimates

The Commission may assess fees and charges under this section by making estimates based on data available to the Commission at the time of assessment.

(d) Time of payment

The Commission shall provide that the fees and charges assessed under this section shall be paid by the end of the fiscal year for which they were assessed.

(e) Adjustments

The Commission shall, after the completion of a fiscal year, make such adjustments in the assessments for such fiscal year as may be necessary to eliminate any overrecovery or underrecovery of its total costs, and any overcharging or undercharging of any person.

(f) Use of funds

All moneys received under this section shall be credited to the general fund of the Treasury.

(g) Waiver

The Commission may waive all or part of any fee or annual charge assessed under this section for good cause shown.

18 C.F.R. § 382.202

Code of Federal Regulations
Title 18. Conservation of Power and Water Resources
Chapter I. Federal Energy Regulatory Commission, Department of Energy
Subchapter W. Revised General Rules
Part 382. Annual Charges
Subpart B. Annual Charges
**§ 382.202 Annual charges under the Natural Gas Act and Natural Gas Policy Act of 1978 and related statutes.**


The adjusted costs of administration of the natural gas regulatory program will be assessed against each natural gas pipeline company based on the proportion of the total gas subject to Commission regulation which was sold and transported by each company in the immediately preceding calendar year to the sum of the gas subject to the Commission regulation which was sold and transported in the immediately preceding calendar year by all natural gas pipeline companies being assessed annual charges.

**APPENDIX B**

DEREK S. FANCIULLO
ASSISTANT CORPORATION COUNSEL
Jersey City Department of Law
City Hall – 280 Grove Street
Jersey City, NJ  07302
(201) 547-5229
dfanciullo@jcnj.org

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————
                               :

| | | |
|---|---|---|
| City of Jersey City | : | Docket No. 12-1475 |
| | : | |
| Petitioner, | : | **Certification of** |
| | : | **Rosemary McFadden** |
| v. | : | **Chief of Staff** |
| | : | |
| FERC | : | |
| | : | |
| Respondent. | : | |

———————————————:

I, Rosemary McFadden, being of full age, hereby certify as follows:

    1.  I have been Chief of Staff for City of Jersey City Mayor Jerramiah Healy for approximately three years.  I am preparing this certification in relation to the City's ongoing litigation against the Spectra New Jersey – New York Expansion pipeline project (the "Pipeline"), and, more specifically, in support of the City's claim of standing with respect to the

53

instant review. A function of my position, I have intimate knowledge of both the City and the Pipeline project.

2.  The Pipeline runs through nearly seven (7) miles of Jersey City, bisecting the City, and running through various, discrete tracts of land in the process.

3.  The Pipeline travels across several dozen parcels of Jersey City-owned property.  Currently, as a result of the FERC order challenged in this case, the City is embroiled in litigation over Spectra's taking of these properties:  Through eminent domain, Spectra has procured easements on the properties, thus hindering – and, in some case, entirely obviating – the city's use of them.

4.  The Pipeline also cuts through and into prime, undeveloped real estate.  As Jersey City is one of the most densely-populated municipalities in America, developable property is scant.  As it has with the City-owned property described above, Spectra has procured easements across and through many of these high-end commercial and residential properties.  This significantly threatens Jersey City's ability to expand its tax base, as the properties may now be exceedingly difficult to fully develop.

5.  The Pipeline runs through some of the most highly contaminated land

in Jersey City – and America. Due to its history as a heavy industrial center, some of Jersey City's land is polluted with incredibly toxic chemicals like Hexavalent Chromium and Benzene. Over several decades, Jersey City has worked hard to clean up these properties – in some cases, even taking the responsible private companies to Court. However, in many cases, remediation of this land is not complete, and the pipeline may interfere with it.

6. The Pipeline makes it more difficult for Jersey City to comply with New Jersey laws. Pursuant to state code, Jersey City contracts with a private, non-profit agency to perform the City's animal sheltering. However, the Pipeline runs through much of the land whereupon the non-profit's facility sits. Spectra's resultant easements make it nearly impossible for the non-profit agency to run properly, thus endangering Jersey City's compliance with Animal Control laws.

7. Finally, the Pipeline presents a massive safety hazard. Again, Jersey City is one of the most densely populated urban centers in the country. Moreover, the City is home to dense, complex – and, in some parts, unique and very old - infrastructure. Pipeline safety experts have indicated that, were the pipeline to rupture, it could leave a crater in Jersey City roughly 1/3-mile wide. This would cause catastrophic damage: Needless to say, the

financial toll would be substantial – likely several billion dollars; the human loss would be incalculably grave.

8.  To this end, the Department of Homeland Security has classified Jersey City as one of only eleven "Tier 1" urban areas in America – city centers that face the greatest risk of terrorist attacks.  Pipelines around the world have been terrorist targets.  To prevent the effectuation of a threat in Jersey City – and, to mitigate other, aforesaid safety concerns in Jersey City – the City must use its own police and fire forces.  In other words, at the same time the Pipeline costs the City the potential expansion of its tax base, it demands the City spend from its own extremely tight budget to help alleviate the problems it creates.

*/s/Rosemary McFadden*
Rosemary McFadden
Chief of Staff
City of Jersey City
280 Grove Street
Jersey City, NJ  07302
(201) 547-5000