Nos. 12-1470, 12-1474 and 12-1475 Consolidated

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No Gas Pipeline, Sierra Club, Food & Water Watch, and City of Jersey City**
**PETITIONERS**

**Vs.**

**Federal Energy Regulatory Commission,**
**RESPONDENT**

**Statoil Natural Gas, L.L.C.,** *et al.,*
**INTERVENORS**

---

**On Petition for Review from the**
**Federal Energy Regulatory Commission**

Carolyn Elefant
Law Offices of Carolyn Elefant
2200 Pennsylvania Avenue N.W.
Fourth Floor East
Washington D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com
*Counsel for No Gas Pipeline*

Ross Scott
Ross Scott Law Firm
1759 Hawks Road
 Andover, NY 14806
(607) 478-8000
w.ross.scott@gmail.com
*Of counsel*

John J. Zimmerman
Zimmerman & Associates
13508 Maidstone Lane
Potomac, MD 20854
(240) 912-6685
jjzimmerman@comcast.net

Richard J. Lippes
Richard J. Lippes & Associates
1109 Delaware Ave.
Buffalo, NY 14209
(716) 884-4800

rlippes@concentric.net
*Counsel for Sierra Club and Food*
*and Water Watch*

**CERTIFICATE AS TO PARTIES, RULILNGS AND RELATED CASES**

**A.     PARTIES**

    1.  The following are parties in this Court

        Petitioner:        No Gas Pipeline

        Petitioner:     Sierra Club

        Petitioner:     Food & Water Watch

        Respondent:     Federal Energy Regulatory Commission

        Intervenor:     Statoil Natural Gas LLC

        Intervenor:     Consolidated Edison of New York LLC

        Intervenor:     Algonquin Gas Transmission LLC

        Interevenor:     Texas Eastern Transmission LP

    2.  Sierra Club is incorporated as a nonprofit  corporation under the laws of the State of California.  Food &Water Watch is incorporated as a nonprofit corporation under the laws of the District of Columbia.  Sierra Club does not have any parent corporation and has not issued any stock.  Similarly, Food & Water Watch does not have any parent corporation and also has not issued any stock.   Therefore, there is no publicly held corporation that owns 10% or more of the stock of Sierra Club.  There

also is no publicly held corporation that owns 10% or more of the stock
of  Food & Water Watch.

**B.      RULINGS UNDER REVIEW**

Petitioners No Gas Pipeline, Sierra Club and Food & Water Watch challenge
two orders issued by the Federal Energy Regulatory Commission, to wit,
*Texas Eastern Transmission LP, Algonquin Gas Transmission LLC,* Order
Issuing Certificate and Approving Abandonment, Docket CP11-56, 139
FERC ¶ 61,138 (May 21, 2012) and *Texas Eastern Transmission LP,*
*Algonquin Gas Transmission LLC,* Order Denying Requests for Rehearing,
Reconsideration, Stay and Late Intervention, 141 FERC ¶ 61,043 (Oct. 18,
2012).  The two FERC orders under review will be included in the deferred
joint appendix (JA   ).

**C.      RELATED CASES**

There are no related cases of which undersigned counsel  is aware currently
pending in this Court  or in any other court involving substantially the same
parties and the same or similar issues.

John J. Zimmerman
Zimmerman & Associates
13508 Maidstone Lane
Potomac, MD 20854
(240) 912-6685
jjzimmerman@comcast.net

# TABLE OF CONTENTS

Table of Cases

Table of Authorities

Glossary

Jurisdictional Statement

Basis of Petitioners Standing

Pertinent Statutes and Regulations

Issues Presented for Review

Statement of Facts

Summary Of Argument

Argument

Conclusion

# TABLE OF CASES

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983)

*Center For Biological Diversity v. United States Bureau of Land Management,* No. 10-72356, (9th Cir. 10/22/2012)

*El Paso Natural Gas Co. v. FERC,* 50 F.3d 23, 26 (D.C. Cir. 1995)

*Friends of Keeseville v. FERC,* 859 F.2d 230, 234 (D.C. Cir., 1988)

*International Brotherhood of Teamsters v. U.S. Deparment of Transportation,* 2013 U.S. App. LEXIS 7836 (D.C. Cir, April 19, 2013)

*Islander E. Pipeline Co. v. Conn. Dep't of Envtl. Prot., 482* F.3d 79, 90-91 (2d Cir. 2006)

*Lugan v. Defenders of Wildlife,* 504 U.S. 555, 559-61 (1992)

*Moreau* v. *FERC,* 982 F.2d 556, 564-567 (D.C. Cir, 1993)

*Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300-301 (1988)

*Shell Oil Co. v. FERC,* 47 F3d. 1186, 1200 (D.C. Cir. 1995)

*Sierra Club v. Environmental Protection Agency,* 292 F.3d 895, 898 (D.C. Cir. 2002)

*Wiilderness Society v. Griles,* 824 F.2d 4, 10-12 (D.C. Cir., 1987)

## TABLE OF AUTHORITIES

Administrative Procedures Act, 5 U.S.C. 706(2)(A)

*An Assessment of the Lung Cancer Risk Associated*
 *with the Presence of Radon in Natural Gas Used for*
*Cooking in Homes in New York State*
by Risk Sciences International

CRS Report R42660, issued August 12, 2012

Institute for Science and International Security,
Preliminary Assessment, December 22, 2010

FERC, 18 C.F.R. 380.6(a)(3)

FERC, 18 C.F.R. 385,213 (2012)

FERC, 18 C.F.R. 385.713 (d)

Mandatory Reliability Standards for Critical
 Infrastructure Protection, Docket No.,
 RM06-22-0000, ORDER NO. 706

FERC Order at 42-44, JA___

Natural Gas Act, Section 7 (b) 15 U.S.C. 717 (r)(b)

Natural Gas Act, 15 U.S.C. 717f (b) and (c)

Natural Gas Act, 15 U.S.C. 717-717z

NEPA, 42 U.S.C. 4321, et seq.

Pipeline and Gas Journal, November, 2009,
Vol. 236, No. 11, "Hacking the Industrial SCADA Network"

*Radon in Natural Gas from Marcellus Shale*
 by Dr. Marvin Resnikoff

*Scientific Issues Concerning Radon in Natural Gas*
 *Texas Eastern Transmission, LP and Algonquin*
*Gas transmission. LLC New Jersey-New York*
 *Expansion Project, Docket No. CP11-5*
 by Dr. Lynn Anspaugh

*Texas Eastern Transmission LP, Algonquin Gas*
 *Transmission LLC,* Order Issuing Certificate
 and Approving Abandonment, Docket CP11-56,
 139 FERC ⭐61,138 (May 21, 2012)

*Texas Eastern Transmission LP, Algonquin Gas*
*Transmission LLC,* Order Denying Requests for
 Rehearing, Reconsideration, Stay and Late
Intervention, 141 FERC ⭐61,043 (Oct. 18, 2012)

*Transwestern Pipeline Company, LLC*
*, 122 FERC 61,165, at P 56 (2008)*

*The Farewell Dossier,* N.Y. Times,
William Saffire, Feb. 2, 2004


*The Radioactive Dangers Associated with
the Hydrofracking Process in the Marcellus
 and Utica Shales in New York State* by Dr. James Ring

# GLOSSARY

| | |
|---|---|
| ALGONQUIN | Algonquin Gas Transmission |
| BLM | Bureau of Land Management |
| CIA | Central Intelligence Agency |
| CRS | Congressional Research Service |
| DCS | Distributed Control Systems |
| DEIS | Draft Environmental Impact Statement |
| DHS | Department of Homeland Security |
| DOT | Department of Transportation |
| EIS | Environmental Impact Statement |
| FEP | Iranian Fuel Enrichment Program |
| FERC | Federal Energy Regulatory Commission |
| JA | Joint Appendix |
| NEPA | National Environmental Protection Act |
| NGA | National Gas Act |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PIR | Potential Impact Radius |
| PLC | Programmable logic controllers |
| SCADA | Supervisory Control and Data Acquisition |
| TEXAS | Texas Eastern Transmission |
| TSA | Transportation Security Administration |

## JURISDICTIONAL STATEMENT

On May 21, 2012, pursuant to Section 7(b) of the Natural Gas Act, FERC entered its order granting a certificate of public convenience and necessity to Texas Eastern Transmission LP and Algonquin Gas Transmission LLC for the NJ-NY Expansion Project.  FERC Order at 42-44, JA ___.  The Environmental Petitioners (No Gas Pipeline, Sierra Club and Food & Water Watch) filed a timely Request for Rehearing on June 20, 2012, JA___.  FERC filed its Order Denying Rehearing on October 18, 2012, disposing of all claims by the Environmental Petitioners.  On December 12, 2012, a timely petition for review was filed in this Court by the Environmental Petitioners.  This Court has exclusive jurisdiction of this petition pursuant to Section 7(b) of the Natural Gas Act, 15 U.S.C. 717(r)(b).  The Court has jurisdiction over the Environmental Petitioners' NEPA claims under the Administrative Procedures Act, 5 U.S.C. 706(2)(A).

## BASIS OF PETITIONERS STANDING

Petitioners No Gas Pipeline, Sierra Club and Food & Water Watch ,

collectively referred to herein as the Environmental Petitioners, are environmental

organizations whose memberships include thousands of individuals, both on a

nationwide basis and in the metropolitan New York and New Jersey area that will

be served by the gas that is delivered through the Texas Eastern Transmission LP

and Algonquin Gas Transmission LLC pipeline to be built as part of the New York

– New Jersey Expansion Project at issue in this case.  Under the precedents of this

Court regarding standing, an organization will have standing to represent the

interests of its members as long as one member of the organization individually

meets the requirements to demonstrate standing.  See, *Sierra Club v.*

*Environmental Protection Agency,* 292 F.3d 895, 898 (D.C. Cir. 2002);  *Moreau v.*

*FERC,* 982 F.2d 556, 564-567 (D.C.Cir, 1993);  *International Brotherhood of*

*Teamsters v. U.S. Department of Transportation,* 2013 U.S. App. LEXIS 7836

(D.C. Cir, April 19, 2013) (slip opinion at 7).  We have attached several

declarations from members of each of the Environmental Petitioners'

organizations.   These sworn declarations establish that each of these individuals is

currently injured by the continuing safety risks from potential explosions, fires and

leaks of gas from the Spectra Pipeline and the ConEd pipeline that will connect to

it.  These declarations also demonstrate that these individuals who use gas-fired

stoves or other gas-fired appliances are currently injured by the certainty that radon

levels in the residences will increase once gas from sources that have higher radon

levels (such as Marcellus gas) than currently supplied gas begins to flow through

these pipelines into their homes.  The continuing safety risk to these individuals,

both from the explosion/fire/leak risk and from the radon risk, establish their

standing.  See, *Moreau v. FERC,* 892 F.2d 556, 564-567 (D.C. Cir., 1993).   Even

if their injuries are characterized as future threatened injuries, given the high

degree of certainty associated with both risks, their standing has been

demonstrated.  As this Court noted in  *Friends of Keeseville v. FERC,* 859 F.2d

230, 234 (D.C. Cir., 1988),  "Particularly where the likelihood of future harm is

demonstrably high, it is often appropriate for courts to intervene before the feared

event occurs."  See also, *Wilderness Society v. Griles,* 824 F.2d 4, 10-12 (D.C.

Cir., 1987).  Clearly, the interests and concerns of the declarants are within the

zone of interests to be protected under NEPA and the Natural Gas Act, *Moreau,*

892 F.2d at 566.  As this Court explained in *Moreau,* referring to the Supreme

Court's opinion in *Lujan v. Defenders of Wildlife.*

> "the Court expressly distinguished cases such as this one, "where
> plaintiffs are seeking to enforce a procedural requirement the disregard of
> which could impair a separate concrete interest of theirs." *Id. at 2142*. The
> Court listed the following as examples of that type of requirement: "The
> procedural requirement for a hearing prior to denial of their license
> application, or the procedural requirement for an environmental impact
> statement before a federal facility is constructed next door to them." *Id*,

and went on to quote the following from *Lujan*:

> There is this much truth to the assertion that "procedural rights" are special: *The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.* Thus, under our case-law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing [**30] agency's failure to prepare an Environmental Impact Statement, even though he cannot establish with any certainty that the Statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. *Id. at 2142-43 n.7* (emphasis added).

Finally, as to the redressability by this Court of the harms to the declarant members of the Environmental Petitioner organizations, there are several ways in which this Court can provide relief to the Environmental Petitioners. Among these may be direction to the Commission to give further consideration to measures to mitigate the risks of leaks, fires or explosions, especially in the area of better security of computer control systems for pipeline operations. Further, the Commission might impose conditions to limit the amount of radon in the gas at the point of delivery from the interstate pipeline to the local distribution company so that levels are kept to current pre-Spectra Pipeline levels. While it obviously is not this Court's job to determine which mitigation measures could be required, this Court certainly has the authority to direct that the Commission, in the first instance, develop such measures.

## PERTINENT STATUTES AND REGULATIONS

The statutes and regulations relevant to this case are set forth in an appendix

to this brief.

## ISSUES PRESENTED FOR REVIEW

**WHETHER THE DISCUSSION OF RADON ISSUES IN THE EIS DOES NOT SATISFY THE HARD LOOK STANDARD**

**WHETHER THE ORDERS UNDER REVIEW AND THE EIS DOCUMENTS FAIL TO ASSURE THAT ADEQUATE CYBER-SECURITY WILL BE BUILT INTO SPECTRA'S SCADA SYSTEMS**

## STATEMENT OF FACTS

Intervenors, Texas and Algonquin, filed an application on December 20,

2010, under Section 7(b) and 7(c) of the Natural Gas Act, 15 U.S.C. §§ 717 f (b)

and (c), requesting authorization for the New York –New Jersey Expansion

Project.  The Commission issued a notice of application on January 5, 2011.  The

Environmental Petitioners submitted a motion to intervene in the proceeding on

January 26, 2011.  In this motion, Environmental Petitioners raised, among other

issues, the potential exposure to increased levels or radioactive radon gas due to

the high content of radiation in Marcellus gas and the short travel time to the

metropolitan New York market that would allow only minimal decay of these

radon levels.  The Environmental Petitioners also raised the issue of vulnerability

of computer systems controlling pipeline operations – including compressor

stations, metering and regulating stations and remotely operated valves -- to cyber

attack from Stuxnet – type computer worm programs and possible resultant

explosion risk.  Further, the Environmental Petitioners asserted that the

Commission would violate NEPA if it segmented the overall pipeline project as

requested by the applicants to exclude environmental review of the ConEd

pipeline.  Finally, the Environmental Petitioners raised concerns about the

management and disposal of PCB wastes in the old pipeline that the applicants

intend to remove.  (JA __).

        Because the project would be a major construction project using

rights-of-way in which there are no existing natural gas pipelines, the Commission

was required by its regulations, 18 C.F.R. § 380.6(a)(3), to prepare an

environmental impact statement to comply with NEPA, 42 U.S.C. § 4321, et seq.

The draft EIS was issued on September 9, 2011.  On September 16, 2011, the

Commission  issued a notice of intent to hold public meetings and receive public

comment on the draft EIS.  The Environmental Petitioners submitted comments on

the draft EIS on October 31, 2011.  The Commission issued the final EIS on March

16, 2012, and issued its order granting the certificate to Texas Eastern and Algonquin on May 21, 2012.

The draft EIS mentioned that it had received comments about the potential for natural gas combustion to increase in radon levels in buildings, but concluded that the radon issue was beyond FERC's scope of analysis in the EIS because EPA had concluded that the primary cause of indoor radon problems is radon from soil gas.   In the comments on the draft EIS submitted by the Environmental Petitioners the point was made that the Marcellus shale produces natural gas with exceptionally high concentrations of radon and that the short travel time for Marcellus gas to reach the New York/New Jersey distribution area would not allow sufficient time for the radon level to fully decay.  The Environmental Petitioners comments included a paper by Dr. James Ring entitled *The Radioactive Dangers Associated with the Hydrofracking Process in the Marcellus and Utica Shales in New York State.*

In the final EIS, FERC dismissed the radon issue as a potential adverse environmental and public health impact.  First , while acknowledging that radon can be entrained in natural gas and burning natural gas can increase the level of radon in a home because radon is unaffected by combustion, FERC stated that the time needed to gather, process, store and deliver natural gas allows a portion of the entrained radon to decay and decrease the amount of radon in the gas before it is

used in a residence.  The Commission next stated that venting of appliance

exhausts from water heaters, furnaces, and other appliances also limits exposure

pathways to radon.   The Commission noted that radon concentrations may be

reduced by 30 to 75 percent when a natural gas stream undergoes processing to

remove liquefied petroleum gas.  It referred to a research report that the cumulative

decay of radon from wellhead to burner tip is on the order of 60 percent and noted

that another research report agreed that indoor radon concentrations are unlikely to

poses a radiological hazard to domestic users.  FERC then speculated that while

the number of deaths due to increased radon concentration could potentially be

higher due to population growth, there is no reason to believe that the conclusions

about radon risk would be any different today, and in fact radon exposure from gas

combustion may be lower now due to improved ventilation and increased energy

efficiency of modern boilers, furnaces and hot water heaters as well as new

building codes requiring venting of gas-fired stoves and ovens.  Finally, FERC

observed that it has no authority to set, monitor or respond to indoor radon levels,

but that:

> "… many local, state, and federal entities establish and enforce radon
> exposure standards for indoor air.  We expect that the combustion of gas
> delivered by LDCs[1] would comply with all applicable air emission
> standards.  In the unlikely event that these standards are exceeded, the
> necessary modifications would be implemented to ensure public safety."

---

[1] "LDC" stands for Local Distribution Company.

Final EIS at Section 4.11.1.5, JA___:

On May 10, 2012, the Environmental Petitioners moved to reopen the administrative record to allow the record to be supplemented to include a newly obtained study entitled, *Radon in Natural Gas from Marcellus Shale* and a declaration by the author of the study, Dr. Marvin Resnikoff.  These materials demonstrate, both qualitatively and quantitatively, the significant nature of the threat posed to end-users of Marcellus gas in the New Jersey-New York area. Without taking action on the Environmental Petitioners motion to reopen the record, the Commission issued its order granting the certificate on May 21, 2012. In its order the Commission said it concurred with the conclusion in the final EIS that indoor exposure to radon from gas used in a residence should be limited.  It went on to state:

> "Radon initially entrained in extracted gas can be expected to be purged in part in the course of gas processing and to decay during transport from wellhead to burnertip.  As the applicants observe, the gas carried in the proposed pipeline will not come from a single source, but will be amalgamated from various supply basins, and be comingled with multiple gas streams in transport over interstate systems en route to the proposed pipeline, thereby diluting radon concentrations in any one source of supply. Also, indoor radon concentrations can be expected to be reduced as a result of improved indoor ventilation; the increased energy efficiency of modern boilers, furnaces, and hot water heaters; and new building codes that require venting of gas-fired stoves and ovens. The Commission has no regulatory authority to set, monitor, or respond to indoor radon levels – local, state, and

federal entities establish and enforce radon exposure standards for indoor air. We expect the combustion of gas transported by the proposed NJ-NY Project to comply with aall applicable air emission standards. "

See, Order Granting Certificate at paragraph 82 (JA__)

On June 20, 2012, the Environmental Petitioners filed a timely request for rehearing and recapped each of their prior submissions on the radon issue. As part of their rehearing request, the Environmental Petitioners requested a hearing before an administrative law judge to ascertain the full extent of the threat posed by radon. In early July 2012, Intervenors Texas and Algonquin attempted to file an answer to the Environmental Petitioners request for rehearing, and included with this filing two reports. The first of these was a paper by Dr. Lynn Anspaugh entitled *Scientific Issues Concerning Radon in Natural Gas Texas Eastern Transmission, LP and Algonquin Gas Transmission, LLC New Jersey–New York Expansion Project, Docket No. CP11-5.* The second paper was by Risk Sciences International entitled *An Assessment of the Lung Cancer Risk Associated with the Presence of Radon in Natural Gas Used for Cooking in Homes in New York State.*

Shortly thereafter, on July 18, 2012, FERC issued an order granting rehearing for further consideration, noting that rehearing requests would be addressed in a future order. This order closed with the statement that, "As provided in 18 C.F.R. §

19

385.713(d), no answers to the rehearing requests will be entertained."  (JA ___)

On October 18, 2012, the Commission issued its order denying rehearing.  In response to the petitioners request for an administrative hearing , the Commission stated,

> Such a hearing would be appropriate were material issues of fact in dispute that cannot be resolved on the basis of the written record.[2]  We believe the written record in this proceeding provides an adequate basis for reviewing and resolving these matters, and thus find no need for the requested hearing.

Order Denying Rehearing at p. 10 (JA __)

In another portion of the Order Denying Rehearing the Commission brought up the Anspaugh and RSI papers and discussed them in detail, noting where the evaluation of radon levels and resultant cancer risks in these papers disagreed with the Resnikoff report submitted by the Environmental Petitioners.  In this discussion, FERC embraced three different radon levels – a level of 151 picocuries per liter of air at the wellhead in Devonian shale (which includes Marcellus and Utica shales) in northeastern Pennsylvania reported by Gogolak and levels of 17 pCi/l at Lambertville NJ and 16.9 pCi/l at Mahwah, NJ, the latter two locations being approximately 70 miles and 50  miles from  the New York metropolitan area.

The petitions for review were filed on a timely basis thereafter in December 2012.

_____

## SUMMARY OF ARGUMENT

The EIS prepared by FERC in this case fails to meet the "hard look" standard under NEPA.  The Commission made conclusory, unsupported fact assertions regarding the environmental impacts of radon in the natural gas that will flow through the Spectra Pipeline.  After granting the certificate in this case, FERC then reviewed various expert papers and reports while rejecting a request for an evidentiary hearing on the material fact issues present by these experts.  This case should be remanded to FERC to conduct an evidentiary hearing before an administrative law judge on the radon issue.

The Orders under review and the EIS documents fail to assure that adequate cyber-security will be built into Spectra's SCADA systems.

# ARGUMENT

# I.

## THE DISCUSSION OF RADON ISSUES IN THE EIS
## DOES NOT SATISFY THE HARD LOOK STANDARD

### A. The draft and final EIS documents provided nothing more to the public than conclusory statements with no factual support in violation of the Commission's NEPA obligations to take a "hard look" at environmental impacts

Radon is an inert, colorless, tasteless, odorless dense gas at standard temperatures and pressures.  It is formed by the radioactive decay of radium, uranium and thorium (all of which have extremely long half-lives) and can only be destroyed by its own radioactive decay which happens with a half-life of 3.83 days. Radon has been identified by the U.S. Environmental Protection Agency as the leading cause of lung cancer among non-smokers, causing about 21,000 cancer deaths per year nationwide.  EPA emphasizes that there is no "safe" level for exposure to ionizing radiation but recommends that mitigation measures are instituted once the level in a residence reaches 2.0 pico Curies per liter (pCi/l) and urges active ventilation and mitigation once the level reaches 4..0 pCi/l.

All natural gas from shale contains radioactive radon with the amount varying widely between different shale deposits across the country.  The natural gas currently supplying the New York City metropolitan area comes primarily

from the Louisiana-Texas Gulf Coast area from a field which naturally has a very low level of radon --5 picoCuries per liter (pCi/l).  It takes approximately 6 to 8 days for this Gulf Coast gas to reach New York so the radon level will be cut in half roughly twice to somewhere around 1 to 1.5 pCi/l when it enters the air in apartments in the City through the gas stove, the predominant type of stove in use in the New York metropolitan area.  Gas is flowing through the stove all the time on stoves with pilot lights.  In stoves with spark ignition systems, gas only flows while the stove is turned on.  Whenever gas is flowing so also is radon.  However, radon does not burn; it is flowing into the indoor air in an apartment whenever the gas is flowing.

 Under NEPA, the federal courts have uniformly adopted the "hard look" standard to measure the adequacy or inadequacy of environmental impact statements. See, eg. *Sierra Club v.Kleppe,* 427 U.S. 390, 410 n.21 9 (1976);  *New York v. Kleppe,* 429 U.S. 1307, 1311 (1976)(Marshall, J. denying application to vacate stay); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 528 (1978);  *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360-374-75 (1989); *Robertson v. Methow Valley Citizens Council,* 490 U.S.332, 349 (1989*)*.

Moreover, compliance with NEPA requires that environmental impacts be be quantified and qualitatively assessed to meet the "hard look" standard.  See,

*Neighbors of Cuddy Mtn. v. U.S. Forest Service,* 137 F.3d 1372, 1379 (9th Cir.

1998)(stating that without "quantified or detailed information…neither the courts

nor the public reviewing the [agency]'s decisions can be assured

that the [agency] provided the hard look that it is required to provide."); *see also*

*Klamath-Siskiyou Wildlands Ctr. V. Bureau of Land Mgmt*., 387 F.3d 989, 993-994

(9th Cir. 2004)("A proper consideration of the cumulative impacts of a project

requires some quantified or detailed information; general statements about possible

effects and some risk do not constitute a hard look absent a justification regarding

why more definitive information could not be provided."); see also *Sierra Club v.*

*Bosworth,* 510 F.3d 1016, 1028-29 (9th Cir. 2007); *Te-Moak Tribe of W.Shoshone*

*of Nevada v. U.S. Dep't of Int.,* 608 F.3d 592, 603-604 (9th Cir. 2010).

        In this case the draft and final EIS documents make references to gas

processing and storage as actions that will reduce radon levels in the gas that will

flow through the Spectra Pipeline.  But FERC provides no specific information

about how and where such processing and storage will take place along this

pipeline.  The Commission also identifies several areas across the county that will

contribute gas to the Spectra Pipeline, but makes no mention of the radon levels in

these other gas sources.  In order to know what the effect of mixing gas from

several sources will be on the radon levels that reach end users it is essential to

know the radon levels from each source and the distance gas must travel to reach

the New York – New Jersey end user.  The final EIS also refers to gas processing

and gas storage as means to reduce radon in the gas ultimately delivered for local

distribution.   However, no processing or storage facilities are identified by name

or location.  Further, although FERC has broad authority to impose conditions to

mitigate environmental impacts, there is no requirement imposed nor any

commitment made by either Texas or Algonquin to include either gas processing

or gas storage anywhere along the pipeline at issue.

This case presents a very similar conclusory fact situation to the one that was

before this Court in *Washington Gas Light Company v. FERC,* 532 F.3d 928

(D.C.Cir., 2008).   The  Court was reviewing a FERC order that would have

allowed expansion of the Cove Point LNG facility.  Washington Gas, a local gas

distribution company, filed a petition with this Court to review the FERC decision,

arguing that the gas that would be delivered to it from the expanded terminal

would cause severe leaks throughout its distribution system.  In its rehearing order

in Cove Point proceeding, FERC concluded that: " there is time for WGL to

complete any remaining corrective measures that are needed on its system so that it

can safely accommodate regasified LNG."  532 F.3d at 931.  In holding that FERC

lacked substantial evidence to support its order, this Court found that FERC made

a totally unsupported assertion that all corrective measures could be made by

Washington Gas in time.  With no factual support for this assertion, FERC lacked

substantial evidence to support its decision.

Similarly in this case, FERC is asserting as fact that processing, storage,

commingling of other gas sources with Marcellus gas will reduce radon to

acceptable levels by the time this gas reaches end users.  As noted above,  FERC

has no support for that conclusion in the EIS.  Not on shred of supporting fact is

cited by FERC.  It is simply an assertion with no underpinning.  Similarly, FERC's

reference to venting "requirements" under other federal, state and local laws will

also reduce radon to acceptable levels.  No statute, regulations, ordinance or code

is cited to support FERC's venting assertions.[3]

### B. If FERC wants to consider the conflicting scientific papers and reports submitted by the Environmental Petitioners' experts and Texas and Algonquin's experts, it should hold an evidentiary hearing before an administrative law judge.

Neither the Resnikoff report nor the reports by Anspaugh and RSI are properly part

of the administrative record at this time.  The Commission never acted upon the

Environmental Petitioners' motion to reopen the record to submit the Resnikoff

report.  Similarly, the reports prepared for Texas and Algonquin were submitted as

part of an attempted answer to the rehearing petitions that FERC refused to

---

[3]  This is not surprising as there are no federal regulations or standards regarding radon levels in
natural gas and local codes in New York actually prohibit venting to outside air in virtually all
existing apartment renovations.  See, *Declaration of Clare Donohue,* attached hereto.

entertain.  Now FERC has decided to look at these reports even though the public
has had no opportunity to comment on them and no evaluation of the information
they present has been examined in an environmental impact statement.  In other
words the entire analysis of the three conflicting reports has been done by FERC in
effect as a post-hoc rationalization for its prior decision to grant the certificate in
this case.  That is not an appropriate "hard look" under NEPA.  The Environmental
Petitioners raised material issues of fact in the Resnikoff report in relation to the
radon discussion in the final EIS and Texas and Algonquin only underscored the
contested nature of the issues related to radon when they submitted the Anspaugh
and RSI papers.  This situation is a textbook example of when FERC should
conduct an evidentiary hearing to resolve conflicting expert opinions.  See, eg.,
*Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988);
*Consolidated Oil & Gas Co. v. FERC,* 806 F.2d 275 ( D.C. Cir., 1986); *Cerro Wire
& Cable Co. v. FERC*, 677 F.2d 124 (D.C. Cir. 1982); and *Citizens for Allegan
County, Inc. v. FPC*, 414 F.2d 1125, 1128 (D.C. Cir. 1969).

## II.

### THE ORDERS UNDER REVIEW AND THE EIS DOCUMENTS FAIL TO ASSURE THAT ADEQUATE CYBER-SECURITY WILL BE BUILT INTO SPECTRA'S SCADA SYSTEMS

### A.   Petitioners have suffered injury in fact from the Commission's Failure to Take A Hard Look at Spectra's Cyber-Security Vulnerabilities.

Petitioners' are aggrieved because the threat of a cyber-attack is real and not merely theoretical, and FERC's orders under review contain no condition that assures Petitioners or the Commission that  Applicants have adequately protected their SCADA systems against a Stuxnet-like cyber-attack.  Overpressure of the pipeline due to a cyber-attack or other software failure could maim or kill Petitioner's members who reside, work, and recreate within the Potential Impact Radius (PIR) of the pipeline, which is about 2.4 miles using PHMSA's formula that takes account of delayed gas cloud ignition.[4]   The FEIS relies on an older formula that assumed immediate ignition, yielding a PIR of only 1003 feet.[5]   The declarations of Leslie Bailey, Joan Beard and Mav Moorhead demonstrate that each them either lives or regularly uses areas well within the PHMSA impact radius of the Spectra Pipeline and the ConEd interconnect.

Petitioners are therefore  "aggrieved" by the order in question, El Paso Natural Gas Co. v. FERC, 50 F.3d 23, 26 (D.C. Cir. 1995), and have established "'injury in fact'

---

[4]      PHMSA Derivation of Potential Impact Radius Formulae for Vapor Cloud Dispersion Subject to 49 CFR 192 FINAL REPORT (TTO Number 14), p. 35

[5]      R. 1310, p 4-238, fn 18, JA __, (FEIS Vol. 1)

to a protected interest." *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1200 (D.C. Cir.

1995).  The above described harm is both "concrete and particularized" and "actual

or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 559-61 (1992).

## B.  Risk of A Stuxnet-Like Attack Is Real And Not Merely Theoretical.

The potential for a catastrophic cyber attack on a pipeline SCADA system

was first demonstrated in June of 1982, when a U.S. Defense surveillance satellite

positioned over the Soviet Union observed the largest non-nuclear explosion ever

seen from space.[6]  The 1982 Trans-Siberian pipeline explosion was claimed to be

the result of CIA sabotage. William Safire, *The Farewell Dossier*, N.Y. Times,

Feb. 2, 2004.[7]

The <u>Pipeline and Gas Journal,</u> in a November, 2009 article entitled "Hacking The Industrial SCADA Network,"

(Vol. 236, No. 11) summarized it as follows:

> It was a Trojan program inserted into SCADA system software that
> caused a massive natural gas explosion along the Trans-Siberian
> pipeline in 1982. A newspaper reported the resulting fireball yielded
> "the most monumental non-nuclear explosion and fire ever seen from
> space."
>
> Malicious hackers have discovered supervisory control and data

---

[6]    R. 1406, p21, JA

[7]    R. 1432, p50, fn 209, JA

acquisition (SCADA) and distributed control systems (DCS) since reports of successful attacks began to emerge after 2001. A former hacker interviewed by PBS Frontline advised that "Penetrating a SCADA system that is running a Microsoft operating system takes less than two minutes." [8]

In late 2009 and early 2010, a more sophisticated cyber-weapon dubbed "Stuxnet" was targeted on centrifuges used in the Iranian Fuel Enrichment Program ("FEP") at Natanz, Iran.  Stuxnet reportedly did this by infecting the Siemens programmable logic controllers (PLCs) in the FEP SCADA system, causing the centrifuges to over-speed until they self-destructed.[9]   In June of 2012,  the Washington Post reported that the effort, involving the National Security Agency, the CIA and Israel's military, has included the use of destructive software such as the Stuxnet virus to cause malfunctions in Iran's nuclear-enrichment equipment..[10]

An  Institute for Science and International Security Preliminary Assessment dated December 22, 2010 cautioned: "Countries hostile to the United States may feel justified in launching their own attacks against U.S. facilities, perhaps even using a modified Stuxnet code. Such an attack could shut down large portions of national power grids or other critical infrastructure using malware designed to

---

[8]     R. 1406, p 21, JA  ; R. 1414, p 11, JA

[9]     R. 1414, p 12, fn 12, JA

[10]    R. 1414, p 12, fn 14, JA

target critical components inside a major system, causing a national emergency."[11]

### C.  The Commission has failed to seriously consider protection of Spectra's SCADA systems against either unintentional (i.e., "natural") malfunctions or cyber threats "by the hand of man."

In the instant matter under review, the Commission has asserted its obligation to consider all environmental impacts, be they from nature or "the hand of man:"

> [T]he environmental impacts from any facilities' failure would be the same whether damage was caused intentionally or accidentally, therefore the "safety and environmental compliance requirements we impose on energy facilities are to ensure the facilities' physical and operational integrity, and thereby protect the facilities against all sources of harm, whether natural (e.g., an earthquake) or by the hand of man." Transwestern Pipeline Company, LLC, 122 FERC ¶ 61,165, at P 56 (2008)."[12]

It also has acknowledged Department of Homeland Security (DHS) reports "of a series of cyber-intrusions targeting natural gas pipeline sector companies in March 2012."[13]

Petitioner raised the issue of SCADA cyber security in its motion to intervene after discovering the topic had not been addressed on Spectra's Resource

---

[11]    R. 1414, p 12, fn 13, JA

[12]    Transwestern Pipeline Company, LLC, 122 FERC ¶ 61,165, at P 56 (2008), cited at R. 1521, p 29, fn 96, JA .

[13]     R. 1521, p 30, fn 99, JA

Report 11, entitled "Reliability and Safety."[14]  Petitioner contended that FERC

should require Spectra to consider a potential Stuxnet-like threat.  A review of the

public record shows that FERC ignored Petitioner's concern, except to include in

the DEIS the following paragraph:

> We received a comment concerning the potential for the Applicants'
> monitoring and data acquisition systems to be vulnerable to computer
> "worms," such as the Stuxnet Computer worm. The Applicants indicated that
> these controls are tested on a continuous basis and that they have fully
> staffed Information Technology and Corporate Security groups dedicated to
> the protection and security of their pipeline control systems. Additionally,
> their staff is certified and trained through the Department of Homeland
> Security and works closely with local, state, and federal agencies reviewing
> and developing safeguards against cyber threats.

We submit that the "hard look" required by NEPA means something more

than the FERC accepting the "applicant's indication" that they employ standard

computer security practices of the kind that were not shown to successfully protect

the Iranian FEP at Natanz.

Petitioner then submitted a timely comment to the DEIS detailing why

FERC  needed to take a harder look at how Spectra was prepared to deal with a

Stuxnet-like attack.   FERC's response was apparently to do nothing, because the

FEIS simply repeated the above paragraph from the DEIS.  No FERC data request

of Spectra concerning this issue was made in the course of the proceeding.   The

---

14       R. 2, JA

Commission ultimately concluded:

> Because the applicants are compelled to protect their facilities and operate their systems in accord with all applicable cyber security requirements, we find no need to impose additional Commission-specific directives at this time.[15]

The Commission is just plain wrong.  No natural gas pipeline company is "compelled" to comply with any cyber security requirements.  DOT's Pipeline Hazardous Materials Safety Administration (PHMSA) has none, and TSA's "best practices" are voluntary.   The Congressional Research Service (CRS) report cited by the Commission supports that understanding:

> As noted earlier in this report, federal pipeline security activities to date have relied upon voluntary industry compliance with PHMSA security guidance and TSA security best practices ….  Addressing this issue the 2008 IG report states that
>
>> "TSA's current security guidance is not mandatory and remains unenforceable unless a regulation is issued to require industry compliance.... PHMSA and TSA will need to conduct covert tests of pipeline systems' vulnerabilities to assess the current guidance as well as the operators' compliance."127[16] [appears at page 25 of the cited CRS Report.]

A subsequent 2012 CRS report entitled  <u>Pipeline Cybersecurity: Federal Policy</u> says it is "open to debate" whether pipeline companies' "self-interest" can

---

15      R. 1521, p30, JA

16      R. 1521, p 30, fn 98

safely be relied upon to protect this critical infrastructure:

> While the pipelines sector has many cybersecurity issues in common with other critical infrastructure sectors, it is somewhat distinct in several ways:
>
> > • Pipelines in the United States have been the target of several confirmed terrorist plots and attempted physical attacks since September 11, 2001.
> >
> > • Changes to pipeline computer networks over the past 20 years, more sophisticated hackers, and the emergence of specialized malicious software have made pipeline SCADA operations increasingly vulnerable to cyber attacks.
> >
> > • There recently has been a coordinated series of cyber intrusions specifically targeting U.S. pipeline computer systems.
> >
> > • TSA already has statutory authority to issue cybersecurity regulations for pipelines <u>if the agency chooses to do so</u>, but it may not have the resources to develop, implement, and enforce such regulations if they are mandated.
>
> TSA maintains that voluntary standards have been effective in protecting U.S. pipelines from cyber attacks. Based on the agency's corporate security reviews, TSA believes cybersecurity among major U.S. pipeline systems is effective.   However, without formal cybersecurity plans and reporting requirements, it is difficult for Congress to know for certain. Whether the self-interest of pipeline operators is sufficient to generate the level of cybersecurity appropriate for a critical infrastructure sector is <u>open to debate</u>.[17](emphasis supplied)

**D.  It is arbitrary and capricious for the Commission to mandate cyber security protection for electric powerlines, but not for gas pipelines.**

On January 18, 2008 the Commission issued its <u>Mandatory Reliability Standards for Critical Infrastructure Protection</u> in Docket No. RM06-22-000,

---

[17]     CRS Report R42660, issued August 12, 2012

ORDER NO. 706, which states at page 78:

> 282.  Therefore, consistent with the discussion above, the Commission directs the ERO, through the Reliability Standards development process, to specifically require the consideration of misuse of control centers and control systems in the determination of critical assets. The clarification of our concern over misuse of control systems addresses Entergy's comment on this issue as well.
>
> 283.  The Commission concurs with SPP that both insider and external threats should be considered as part of a risk-based assessment.[18]

So the Commission's disinclination to provide the same level of protection to the SCADA systems of the Nation's pipeline infrastructure is arbitrary and capricious.

### E. Besides failing to take a hard look at the threat of a Stuxnet-like attack, the Commission allowed Spectra to answer Petitioner's request for rehearing, then misread the answer to purport there are no SCADA-controlled upstream compressors.

In the May 21, 2012 order the Commission made no reference to Petitioner's Stuxnet concern or SCADA reliability, let alone not imposing a certificate condition.  Petitioner then further elaborated the Stuxnet and SCDA reliability issue in its Request for rehearing.  In it's October 18, 2012, order the Commission finally addressed the issue.   It did this by allowing Spectra to answer Petitioner's Request for Rehearing, in derogation of 18 C.F.R. § 385.213 (2012) prohibiting

---

[18]     Mandatory Reliability Standards for Critical Infrastructure Protection Docket No. RM06-22-000 ORDER NO. 706, p 78.

such answers.  It then took Spectra's representation that overpressure devices on its

upstream compressors were not connected to its SCADA system[19], and distorted

that into a statement that the upstream compressors were not controlled by a

SCADA system, and "are therefore not likely vulnerable to a similar cyber

attack."[20]   Such misrepresentation is at least arbitrary and capricious.

### F.  Statutory And Regulatory Background.

Natural Gas Act (NGA or "The Act").  In the Natural Gas Act, 15 U.S.C. §§

717-717z, Congress "wholly preempted and completely federalized the area of

natural gas regulation." *Islander E. Pipeline Co.* v. *Conn. Dep't of Envtl. Prot.*, 482

F.3d 79, 90-91 (2d Cir. 2006). The Act confers on the Commission "exclusive

authority" over "the rates and facilities of natural gas companies used in th[e]

transportation and sale" of natural gas. *Schneidewind* v. *ANR Pipeline Co.*, 485

U.S. 293, 300-301 (1988).  The Commission has virtually unlimited authority to

---

19      "These devices are not linked to the Spectra Energy Companies' SCADA system or any other computer program and thus are not vulnerable to a computer virus." R. 1433, p 49, JA.

20       "The applicants point out that SCADA system security has improved markedly since 1982, and state that the upstream compressors on the Texas Eastern system, unlike those on the Trans-Siberian system in 1982, are equipped with overpressure protection devices, are not linked to the Spectra Energy Companies' SCADA system or any other computer program, and are therefore not likely vulnerable to a similar cyber attack." R. 1521, p 30, JA

attach conditions to any certificate of public convenience and necessity it issues

under Section 7c of the NGA.  It thus has the ability to condition Spectra's

certificate to require Spectra to report to FERC what cyber intrusions have been

seen at Spectra's Gas Control center, and what Spectra has done about it.

     National Environmental Policy Act (NEPA).  NEPA,  42 U.S.C. Sec. 4321-

4437, "establishes a national policy to encourage productive and enjoyable

harmony between man and his environment."  The Supreme Court has identified

NEPA's "twin aims" as "plac[ing] upon an agency the obligation to consider every

significant aspect of the environmental impact of a proposed action[, and]

ensur[ing] that the agency will inform the public that it has indeed considered

environmental concerns in its decision making process." Baltimore Gas & Elec.

Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97 (1983).

     **G.  Because The Commission Has Relied On An Unenforceable Set of
Requirements Claimed to be Enforceable by Another Government Agency
When They were Not, the Commission's Orders are Arbitrary and
Capricious.**


     It seems obvious that when a NEPA assessment discloses an environmental

impact that it is within the Commission's jurisdiction and ability to mitigate by an

enforceable certificate condition, and no other agency has such authority, then it is

arbitrary and capricious for the Commission to purport to delegate such enforcement to another agency by Order, regulation, or otherwise.

This issue was decisive in *Center For Biological Diversity v. United States Bureau of Land Management,* No. 10-72356, (9th Cir. 10/22/2012).  In that case, the Endangered Species Act (ESA), required an enforceable Conservation Plan before BLM could authorize the Ruby Pipeline, which also required a FERC 7c certificate.  BLM issued the order, notwithstanding that the plan was unenforceable.  The Ninth Circuit invalidated the BLM order as arbitrary and capricious.  Because the Commission purports to delegate enforcement of cyber-security to PHMSA and/or TSA, neither of which can enforce cyber-security requirements, the holding of *Center for Biological Diversity* would seem apposite.

## CONCLUSION

For the foregoing reasons the FERC orders in this cae should be remanded to the Commission to supplement the EIS to take a hard look at radon and Stuxnet issues, including an evidentiary hearing before an administrative law judge.


Respectfully submitted,


_____

John J. Zimmerman
Zimmerman & Associates
13508 Maidstone Lane
Potomac, MD 20854
(240) 912-6685
jjzimmerman@comcast.net

April 23, 2013